## Tampa Electric Co., Petitioner, *v.* Commissioner of Internal Revenue, Respondent.

Dockets Nos. 13344, 28332, 29593. Promulgated June 29, 1928.

*George W. Matthews, Esq.*, for the petitioner.
*Orris Bennett, Esq.*, and *Hartford Allen, Esq.*, for the respondent.

OPINION.

ARUNDELL: The facts in the first assignment of error, that of whether amounts paid to the petitioner in aid of the construction of extensions of its power lines to the premises of the contributors are taxable income, do not differ in any material respect from those in other similar cases heretofore decided by us, wherein we held con-

trary to the contentions raised by the respondent here. Following the principle laid down in those cases, the respondent is reversed. *Liberty Light & Power Co.*, 4 B. T. A. 155; *El Paso Electric Co.*, 10 B. T. A. 79; and *Frank Holton & Co.*, 10 B. T. A. 1317. See also *Edwards* v. *Cuba Railroad Co.*, 268 U. S. 628.

In view of the fact that the elimination of the item of $5,219 from 1920 income will reduce the deficiency for that year, it follows that a recomputation of invested capital for 1921 will need to be made to reflect the prorated correct amount of the 1920 deficiency, if any remains after the adjustment. *The Kolynos Co.*, 4 B. T. A. 520.

The invested capital returned by the petitioner for 1921 and determined by the respondent includes the sum of $5,219 received by the former in 1920 for making power line extensions. A similar situation was before us in the case of *Frank Holton & Co.*, *supra*, wherein we held that no part of the cost of the property donated to the petitioner as an inducement to move its business to the city in which the donors resided should be included in invested capital. Following that decision and the principles laid down in the cases cited therein, we are of the opinion that petitioner's invested capital for 1921 should be reduced by the amount of the payments in question.

The first assignment of error for the year 1922 concerns the question of whether the petitioner sustained a loss of $232.53, as contended by it, or realized a profit of $10,367.47, as contended by the respondent, as a result of the loss by fire in 1922 of a bathing pavilion. The building was acquired by purchase in 1902. The purchase price, including the cost of improvements made prior to and in 1906, was $11,500. According to the statement accompanying the deficiency letter, the cost of repairs made to the building as a result of damage caused by a storm in 1921 was $13,265.06, of which one-half, or $6,632.53, was charged to depreciation reserve and the other half to profit and loss. After the destruction of the building the petitioner collected $20,000 from an insurance company under an insurance policy covering the property. The respondent's determination of a profit of $10,367.47 was computed as follows:

| | | |
|---|---|---|
| Total cost of building in 1921 | | $11,500.00 |
| Less depreciation at 4 per cent per annum | | 8,500.00 |
| Depreciated value, 1921 | | $3,000.00 |
| Cost of repairing portion of building damaged by storm in 1921 | $13,265.06 | |
| Charged to profit and loss | 6,632.53 | |
| Balance charged to depreciation reserve | | 6,632.53 |
| Depreciated cost, 1922 | | 9,632.53 |
| Insurance received account of fire in 1922 | | 20,000.00 |
| Profit | | 10,367.47 |

The petitioner's computation of a loss of $232.53 on the transaction was made by adding to a March 1, 1913, value on the building of $20,000, the amount of $6,632.53 for betterments made in 1921 or 1922, and deducting from the total thus reached the figure $6,400 for depreciation from March 1, 1913.

The only evidence before us concerning the March 1, 1913, value of the building consists of the depositions of R. M. Prince, a fire insurance agent, Earl G. Moore, vice president of a real estate development company, and Charles T. Friend, a general contractor, who testified on behalf of the petitioner that the structure had a value at that time of between $20,000 and $25,000. The knowledge these witnesses had of the building was acquired from occasional visits at the place for the amusements it afforded. Upon cross-examination two of the witnesses admitted that they did know the age of the building, and one of the witnesses frankly stated his inability to estimate the life of the property. Their opinions of the March 1, 1913, value of the building were furthermore based upon an estimated reproduction cost, without allowance for depreciation, and did not purport to be an opinion of the fair market value of the property. In *Rockford Malleable Iron Works*, 2 B. T. A. 817, we said, *inter alia*, that:

The value of property on March 1, 1913, *is its actual value* on that date, and that valuation can not be determined by any sort of theoretical computation, even though that theoretical computation starts with a reproductive value based upon cost of similar property. Value is a real, actual, definite thing, and, in many instances, cost or depreciation, or both, have very little to do with it. Value is what the property is worth. It is what it would bring in the open market if offered for sale by an owner willing, but not compelled, to sell to a purchaser willing, but not compelled, to buy.

Valuations based upon reproduction costs are not of themselves of sufficient evidentiary value to overcome the *prima facie* presumption that exists in favor of the respondent's determination. *Rockford Malleable Iron Works, supra; Hart Cotton Mills*, 2 B. T. A. 973; and *Red Wing Linseed Co.*, 5 B. T. A. 390.

Having failed to prove the fair market price or value of the building at March 1, 1913, we lack one of the essential factors to determine whether the transaction resulted in a loss or profit, and must sustain the respondent's action. *J. W. Kelly*, 6 B. T. A. 1221, and *Commercial Trust Co.*, 8 B. T. A. 1138.

The second assignment of error for the year 1922 pertains to the disallowance as a deduction in that year of the amount of $13,904.96, representing the cost of repairs made in 1922 on account of property damage caused by a hurricane in October, 1921. The respondent disallowed the deduction on the ground that the loss was not sustained in 1922 and admitted in his answer that the sum of $13,904.96 was expended in that year. The damage caused by the storm was

extensive and some of it of such a nature that it was not possible for the petitioner to complete all of the necessary repair work in 1921. Of the cost of all work done in 1922 at places where damage occurred the petitioner charged $61,762.39 to " Plant " and the balance· of $13,905.96 to expense for repairs. The work classified as repairs consisted of rewinding armatures damaged by salt water; dredging a fill washed into the bay, and repairs of a miscellaneous character to a steam plant, lighting lines, machinery, a building and passenger cars. We are convinced from a careful consideration of all the evidence that the work performed may be properly characterized as repairs and as such constitute an allowable deduction in 1922. See *Illinois Merchants Trust Co., Executor*, 4 B. T. A. 103, and *Yakima Hop Co.*, 8 B. T. A. 441.

The record is not clear as to when the land, the March 1, 1913, value of which is in question, was acquired, but it appears to have been purchased in 1900 or within a year or two thereafter. The property was covered with a thick stumpage of cypress and a large part of it, but less than 75 per cent, was covered by from 6 inches to 6 feet of water in extremely wet weather. The land was acquired at a price of $1.50 per acre and sold in 1923 for $10 per acre. The petitioner is claiming a valuation of $7.50 per acre on March 1, 1913, for the purpose of computing the profit realized from the sale. The revenue agent's report of the petitioner's tax liability for the years 1922 and 1923 discloses the determination by him of a valuation of $5 per acre. The respondent declined to accept this valuation and computed the profit on the transaction on the basis of cost of $1.50 per acre.

From a careful consideration of the depositions of the two witnesses presented by the petitioner to establish the March 1, 1913, value of the land, which constitute the only evidence before us on the question, we have reached the conclusion that the fair market value of the property at that date was $5 per acre.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*

STERNHAGEN, dissenting: As I stated in dissenting from the opinion of the Board in *Liberty Light & Power Co.*, 4 B. T. A. 155, I am of opinion that the amounts, which in this case appear to have been steadily received in the ordinary course of business from persons in outlying districts requiring service, were within the petitioner's ordinary income as provided by the broad terms of section 233 of the Revenue Acts of 1918, 1921, and 1924. I, therefore, think that the deficiency for 1920 on this account was proper and its effect must be carried into the computation of invested capital for 1921. Furthermore, it seems to me clear that the amounts received for making

extensions were within the corporation's earned surplus and, hence, a proper part of its statutory invested capital. The only possible theory I can think of upon which these amounts could be excluded from earned surplus would be the theory that they were gifts made by the numerous persons who desired service, and this theory seems to me to be so patently unsound as to require immediate rejection. The money was not donated but was paid to the company under ordinary business contracts, and until there is stronger authority than a supposed analogy to the subsidy considered in the *Cuba Railroad* case, I must continue to regard it as income which may, under permissible circumstances, become earned surplus.

MARQUETTE and MURDOCK concur in the dissent.