**BUFFALO UNION FURNACE CO. v. HELVERING, Com'r of Internal Revenue.**

**HELVERING, Com'r of Internal Revenue, v. BUFFALO UNION FURNACE CO.**

No. 185.

Circuit Court of Appeals, Second Circuit.

July 31, 1934.

William P. Belden, of Cleveland, Ohio, and Ralph Ulsh, of Buffalo, N. Y. (Belden, Young & Veach, of Cleveland, Ohio, and Slee, O'Brien, Hellings & Ulsh, of Buffalo, N. Y., of counsel), for taxpayer.

Frank J. Wideman, Asst. Atty. Gen., and Sewall Key and Norman D. Keller, Sp. Assts. to Atty. Gen., for Commissioner.

Before L. HAND,. SWAN, and CHASE, Circuit Judges.

L. HAND, Circuit Judge.

These appeals (petitions to review) arise upon three returns of the taxpayer for its fiscal years, ending April 30, 1919, 1920 and 1921. The questions involved on the taxpayer's appeal are four: (1) Whether it should have been allowed a deduction for a so-called "relining reserve" for the years 1920 and 1921. (2) If the reserve was properly disallowed, the proper amount to be added for the year 1920. (3) Whether the taxpayer should be allowed to deduct as an ordinary and necessary expense for the year 1919, certain sums spent for restoring a collapsed ore dock. (4) Whether its return for the year 1921 should be surcharged with the sum of $70,863.88, collected by settlement with certain railroads as reparation for unlawful discrimination, between August 1, 1905, and March 31, 1914. The Board decided that the "relining reserve" was not a proper deduction, and refused to allow it, but raised the deduction for depreciation on the whole plant to ten per cent., the Commissioner having allowed only five per cent. This change was made because of the extraordinary rate of destruction of the furnace linings. It next held that the taxpayer had failed to show any error in the amount of the deduction disallowed for lining reserve in 1920; and it also refused to allow as an ordinary and necessary expense the restoration of the dock. The Commissioner had allowed the expense of clearing away the débris, and, as a loss, the depreciated value of the dock as it stood. Finally it charged the taxpayer's return for 1921 with the amount of the full settlement which the railroads paid in that year. The Commissioner at the hearing on the taxpayer's appeal for the year 1919, attempted to get a reconsideration by the Board of his mistaken allowance of the deduction of the "relining reserve." He argued that he was entitled to do this under section 274 (e) of the Revenue Act of 1926 (26 USCA § 1048c); but the Board said no. It held that, having allowed this item so long before, his delay in challenging it had been too great, and barred his remedy. This was the only subject of his appeal.

The Deduction of the "Relining Reserve."

The taxpayer was an iron-founder with three blast furnaces lined with fire-brick. Owing to the great heat necessary, the linings were repeatedly used up and had to be restored; sometimes a lining would last only three months, sometimes five or six years, but the average was between two, and two and a half, years. To provide against the periodic but uncertain lining of the furnaces, the taxpayer had established a practice for a considerable period before 1918 of keeping on its books a reserve to cover the expense when it occurred. Originally this credit was made up of a charge of twenty cents for every ton of iron made, which was increased to thirty cents on November 1, 1916, and to fifty cents on May 1, 1917. This was a common practice among iron-founders and a prudent way to keep the books, as a means of preparing for the heavy sporadic outlays. The taxpayer's position is that such reserves were "ordinary and necessary expenses" of the business and deductible as such. The Commissioner and the Board thought not; they argued that such a reserve was merely for the convenience of the founder, that it represented no outlay, not even a transaction; and that although the taxpayer kept its books on an accrual basis, there was no existing debt to accrue.

There can be no doubt of the correctness of this conclusion. The taxpayer might accrue the cost of relining its furnaces as soon as it contracted to have the work done; but obviously it was no affair of the Treasury that it provided in advance a bookkeeping entry, or even a fund, to meet certain charges when they should arise. No practice, however general in the business, could disguise this, or turn a precaution into a debt. It is quite another matter whether when the contracts for relining were made, they should be treated as deductible "ordinary and necessary expenses," or whether they should be allowed as a depreciation under section 234 (a) (7) of the Revenue Act of 1918 (40 Stat. 1077). That is often a nice question, and it cannot be solved in general terms. Harris & Co. v. Lucas, 48 F.(2d) 187, 188 (C. C. A. 5); Commissioner v. Brier Hill Collieries, 50 F.(2d) 777, 779 (C. C. A. 6); Libby & Blouin v. Com'r, 4 B. T. A. 910, 913. It is of no consequence here in the years 1920 and 1921, because the taxpayer relined no furnaces in either, and there is no evidence to prove that the deduction for depreciation and obsolescence was too small.

But the question does arise in 1919, because, as will appear, we are allowing the Commissioner's appeal which will permit him to cancel the deduction of the "relining reserve" for that year. That was about $127,000, and in that year the taxpayer spent $117,000 for relining one of the furnaces. If the proper allowance is as an expense, the net addition to the income will be only $10,000; if not, it will be $127,000. In the first event obviously the deduction for deprecia-

tion cannot also stand, for the Board fixed the rate at ten per cent. to include the cost of periodic relinings. The taxpayer may well prefer to allow the account as it is, with a ten per cent. allowance, than to take the deduction of $117,000 and to have the depreciation reliquidated, say at the five per cent. which the Commissioner originally allowed. But regardless of its preference, an allowance for relining more properly falls under depreciation than repair. The Regulations (article 103 of Regulations 45) did attempt a rigid division. "Repairs in the nature of replacements, to the extent that they arrest deterioration and appreciably prolong the life of the property, should be charged against the depreciation reserve." But what is a "replacement" is left open, and is impossible to define a priori. The substitution of a valve, or of a piece of pipe, would scarcely be one; the truth being that it is too small an incident, too regularly repeated in the life of any large factory. That was at least one reason why the replacement of the piping in Libby & Blouin v. Commissioner, supra, 4 B. T. A. 910, was not treated as a capital expense. We are therefore disposed to call the relining of these furnaces a replacement. The furnace had to be laid off for a considerable time, and the whole interior cleaned of the old brick and relined with new; the expense of this was roughly from $50,000 to $100,000 for each furnace. The more natural way to treat such a charge is to carry it as a depreciation, and we think that the Board was right in so doing. As we have said, the Board added five per cent. to the depreciation allowance for the very purpose of meeting the inordinate depreciation and obsolescence of linings; this was calculated on the whole investment, though it covered only the linings. It seems to us a proper way to deal with the item and since the taxpayer does not claim that the allowance as a whole was insufficient, we affirm the order as to this question.

### The Commissioner's Appeal.

The Commissioner's appeal is especially apposite here. In 1919 he had mistakenly allowed the "relining reserve" as a deduction, and it was not until the taxpayer took its own appeal on other grounds, that he sought to cancel it. The Board refused his prayer because of his delay. Its power depends upon section 274 (e) of the Revenue Act of 1926, which explicitly provides that if the Commissioner asserts a claim to a greater deficiency at or before the hearing, the Board may increase it; that is a risk to the taxpayer inherent in his appeal. The Commissioner indeed argues that the Board must consider his claim, no matter what the circumstances, but we need not go so far and we do not; we are content to dispose of this case on the assumption that they have a discretion; but we can see no ground for exercising it against him in this case. The issue raised was not really new; it was the same as that necessarily considered for 1920 and 1921; all the Commissioner asked was that the rulings should be consistent. No proof had become unavailable to the taxpayer; nor had its defence been prejudiced in any other way. All that was needed was to show that the Commissioner had allowed the deduction originally. The taxpayer, having seen fit for any reason to seek a reassessment of its tax for that year, threw open its income for all purposes, and the Board was bound not to do justice by halves. Of course if the deduction is cancelled, a corresponding deduction of 10% for depreciation must be allowed, unless that has already been done. This will stand in the place of the actual expense of relining the "A" furnace, in accordance with our discussion under the last heading. The order is reversed pro tanto and the cause remanded for recomputation of the tax.

### The Dock Repairs.

In the autumn of 1918, and therefore within the fiscal year of 1919, a large part of the taxpayer's dock—400 out of 2,300 feet— slid into the Buffalo River. It had to be replaced, but before that could be done the channel had to be cleared and many tons of ore salvaged, which had gone out with the dock. Thereafter the dock was rebuilt, and the land back of it filled in; it had gone out to a width of fifty feet. All this was done in most substantial fashion; loaded cribs for the dock, and for the hinterland, piles driven to bed rock with a two foot concrete layer holding their tops together. The Commissioner allowed the cost of clearing the channel, recovering the ore and dredging out the back fill as an expense, but he refused to allow the cost of the new construction, except to the unamortized value of the old dock which he did allow as a loss. The taxpayer asserts that he should have allowed the cost of the new dock as a necessary or ordinary expense under section 234 (a) (1) of the Revenue Act of 1918 (40 Stat. 1077).

The Board thought and we agree that the situation was within our decision in Hubinger v. Com'r, 36 F.(2d) 724, where we said that in the main, "losses" under Revenue Act 1918, § 214 (a) (4) and section 214 (a) (6), 40 Stat. 1066, are those occasioned by casualties,

and that repairs, so far as they are "ordinary and necessary expenses," are the more or less continuous minor break-down and wastage of machinery, buildings and the like. We made no pretence that this classification was mutually exclusive; indeed we noticed that a small fire for instance might be repaired by an "ordinary and necessary expense," while a larger one would be a "loss." To this we adhere, in spite of Zimmern v. Com'r, 28 F. (2d) 769 (C. C. A. 5), which we discussed at the time. It is too plain for argument that if this be the right rule, the repairs were not within section 234 (a) (1), but that the only allowance possible was as a "loss." As the taxpayer made no effort to prove a loss as required by the Regulations (articles 49 and 141, Regulations 45), the action of the Board was correct and is affirmed.

### The Supposed Error in Computation.

Having held that the amounts credited to the "Relining Reserve" were not properly deductible from the income, the question arises whether for the year 1920 the proper addition to income was $212,000 as the Commissioner found, or $152,000 as the taxpayer asserts. The doubt arises because of the taxpayer's books, which the Commissioner put in evidence. These showed on May 1, 1919, a balance in the reserve of $60,000, to which $152,000 was added by crediting the account with fifty cents a ton. Both figures are, strictly speaking, irrelevant; the important question is, what was the deduction which the taxpayer actually took. If it took the whole credit at the end of the year—$212,000—obviously that amount must be added to the income; if it took only the new credits of the year, these alone should be added. As we have not the return before us for that year, it is impossible to say which is the right figure. There are feeble indications, scarcely amounting to proof, that the examiner understood the deduction on the return to have been the whole balance at the end of the year. On the other hand it is extremely unlikely that so transparently improper a figure should really have been used. The taxpayer has indeed the burden of proof and it must be owned that its evidence is far from cogent. However, the issue cannot lead far afield, or be troublesome to decide, and there would be a great injustice in charging its income with $60,000, if it never took such a deduction. As we said in Taylor v. Helvering, Com'r, 70 F.(2d) 619, 621, the statute itself provides for a rehearing when "justice may require" one (section 1003 of the Revenue Act of 1926 [26 USCA § 1226]); and this we think

enables us to moderate the severity of a rigid application of the burden of proof. The Board should ascertain what was the actual deduction taken, and the order is reversed and the cause remanded for that purpose.

### The Payments by the Railroads.

From August 1, 1905, until March 31, 1914, the taxpayer did its own "car spotting" within its plant. Learning that the railroads performed this service for other iron-founders as part of the rate, the taxpayer protested and got an order from the Interstate Commerce Commission compelling them to "spot" cars for it as for others. It then after much delay, procured a "reparation order" from the Commission in the sum of about $140,000 for "unjust discrimination" over the period mentioned. That was on April 9, 1917, but the railroads still resisted. The taxpayer then sued them, but settled the actions before they were reached for trial, receiving $70,863.88 during its fiscal year, 1921. Throughout the period when it was "spotting" its own cars it deducted the cost of the work in its return; that is for the years when it made any returns, but it charged itself on its 1921 return with no part of the money received in settlement. The Commissioner surcharged its income with the whole fund, and the last issue is as to the correctness of his action.

The propriety of charging such items to income at all depends upon their deduction in earlier years. If a taxpayer paid the expense and got the reimbursement in the same taxable year, the two items would cancel; if on the other hand he has used the deductions in one year, and the reimbursement comes in in the next, he must surcharge his income correspondingly. The rationale of this is explained in Burnet v. Sanford & Brooks Co., 282 U. S. 359, 51 S. Ct. 150, 75 L. Ed. 383. Since Congress has always computed income by annual periods, correlative items which would cancel, may enter into opposite sides of two returns, although the receipt be only to repay an outlay. The right to keep books on an accrual basis in some measure corrects the artificiality of this result, as Justice Stone observed; but accrual will not serve to accelerate a claim which is inherently too contingent to be counted. Lucas v. American Code Co., 280 U. S. 445, 50 S. Ct. 202, 74 L. Ed. 538, 67 A. L. R. 1010; Lucas v. North Texas Lumber Co., 281 U. S. 11, 50 S. Ct. 184, 74 L. Ed. 668; North American Oil Consol. v. Burnet, 286 U. S. 417, 52 S. Ct. 613, 76 L. Ed. 1197. And so the fact that this taxpayer kept its books on an accrual

basis, and accrued these sums upon them is not conclusive.

We think that the claim was never certain enough for accrual, until it was finally settled. That depends upon how much was settled by the order of the Interstate Commerce Commission, and how far the issues were open in the courts. Had the actions been to recover damages from giving rebates, no preliminary resort to the Commission was necessary at all. Pennsylvania R. Co. v. International Coal Mining Co., 230 U. S. 184, 33 S. Ct. 893, 57 L. Ed. 1446. The same is not true of an action to recover for discrimination, if the issues involve what is a fair car distribution, or similar "administrative" questions. Morrisdale Coal Co. v. Pennsylvania R. Co., 230 U. S. 304, 33 S. Ct 938, 57 L. Ed. 1494. But if the action is for disregard of a published rate or rule or practice whose validity is not in question, the action may be brought without preliminary inquiry. Baltimore & Ohio R. Co. v. Brady, 288 U. S. 448, 53 S. Ct. 441, 77 L. Ed. 888. So far as here appears, these actions raised no "administrative" questions; the claim was that the same services were not in all cases included in the same rate. Of course, that might involve "administrative" questions, but it need not. If the published rate were for example the same over a given zone, and the railroads "spotted" the cars of all iron-founders except the taxpayer, a court and jury were quite competent to pass upon the issues without the assistance of the Commission. As the shipper need not in that event have gone to the Commission, so the Commission's findings would be no more than prima facie valid; the carriers were free to dispute all the facts, as they did. Meeker v. Lehigh Valley R. Co., 236 U. S. 412, 430, 35 S. Ct. 328, 59 L. Ed. 644, Ann. Cas. 1916B, 691. In liability therefore the claim was still contingent. We think it was contingent as well in amount. It is true that the taxpayer's books contained all the items, but they were not conclusive. They may have included many items not properly allowable as part of "spotting" expenses; overhead and other general items apportioned, and the like. The line is hard to draw,

(Continental T. & L. Co. v. U. S., 286 U. S. 290, 52 S. Ct. 529, 76 L. Ed. 1111); but when the claim was open to such contest both as to existence and amount, and especially when the taxpayer accepted a settlement of about half its face, it was not accruable. Commissioner v. Southeastern Express Co., 56 F. (2d) 600 (C. C. A. 5). With so much of it as is properly apportioned against the period from March 1, 1913, to March 31, 1914, we think that the income should have been surcharged and that the Commissioner was right.

Not so, however, as to the period from August 1, 1905, to March 1, 1913. The unlawful discrimination of the roads, if it existed, was a tort which gave rise to a cause of action as soon as the taxpayer was damaged; that is, when it was forced to "spot" the cars. The fact that the claim might be contingent is here irrelevant; the important point is that the transaction as a whole took place before the date when an income tax became constitutional. As the taxpayer could not deduct any part of the expense from its income before March 1, 1913, there was no reason for surcharging its income in later years; both items must be possible of entry in an income tax return. To put it in another way, there can be no charge in such cases except as a gain. The taxpayer entered the income tax zone, so to say, with certain claims against the railroads for past torts. Park v. Gilligan (D. C.) 293 F. 129; Safety C. H. & L. Co. v. U. S. (D. C.) 5 F. Supp. 276. So far as these were eventually paid at a greater amount than their value on March 1, 1913, it might be possible to surcharge the income. There is no such proof here, and it would be fantastic to hold the taxpayer on the theory that it had not shown the value of the claims on March 1, 1913. So far as the Board surcharged the income with that portion of the settlement properly apportionable to the period before March 1, 1913, we think it was wrong. It may be that the apportionment cannot be made on the record as it stands. The order must be reversed as to this item and the cause remanded.

Order reversed; cause remanded for further action in accordance with the foregoing.