R. R. HENSLER, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6677–75. Filed October 29, 1979.

*Joseph Anthony Kouba,* for the petitioner.
*Kenneth G. Gordon,* for the respondent.

DRENNEN, *Judge:* Respondent determined the following deficiencies in petitioner's income tax:

| FYE Jan. 31— | Deficiency | FYE Jan. 31— | Deficiency |
|---|---|---|---|
| 1968 | $112,230.93 | 1970 | $194,682.36 |
| 1969 | 122,390.40 | 1972 | 51,378.36 |

The issues[1] presented for our resolution are the following:

(1) Whether petitioner's expenditures for repairs of equipment damaged by floods constituted ordinary and necessary business expenses within the purview of section 162, I.R.C. 1954.[2]

(2) If petitioner's expenditures are not deductible under section 162, but can only be deducted pursuant to the rules and regulations of section 165, is petitioner precluded from deducting its expenses due to a reasonable prospect of recovery of all or part of its expenses in the years that are now before the Court.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts, together with the attached exhibits, are incorporated herein by reference.

R. R. Hensler, Inc., the petitioner herein, is a corporation organized and existing under the laws of California, with its principal office in Sun Valley, Calif. The returns for the periods herein involved were filed with the District Director of Internal Revenue for the Los Angeles District of California. Petitioner is, and has been since its incorporation, engaged in the business of contracting for and performing construction projects involving the excavation and transportation of large quantities of dirt, rock, and other materials. Additionally, petitioner has designed,

---

[1]Due to concessions by both petitioner and respondent, decision will be entered under Rule 155, Tax Court Rules of Practice and Procedure.

[2]All section references are to the Internal Revenue Code of 1954, as amended and in effect in the years in issue, unless otherwise indicated.

built, owned, rented, and repaired many pieces of construction machinery and equipment used by it in the performance of its construction contracts.

On June 6, 1967, a contract was entered into between petitioner and the Los Angeles County Flood Control District. The contract obligated petitioner to excavate, transport, and dispose of approximately 10 million tons of dirt and debris that had collected in the San Gabriel Dam Reservoir, a flood control reservoir, located in San Gabriel Canyon in Los Angeles County, Calif. Pursuant to the terms of the contract, the dirt and debris were to be excavated from an area immediately behind and upstream from the San Gabriel Dam, and were to be transported to a disposal area known as Burro Canyon, which canyon is approximately 3 miles upstream from the dam. Payment under the contract was based upon the amount of dirt removed from the channel by the petitioner.

Petitioner knew at the time it entered into said contract that flooding of the reservoir was a normal hazard that might be encountered in the course of performance of the contract, and that there was a possibility of water disrupting work by flowing through the channel. In fact, the specifications issued by the Los Angeles County Flood Control District covering the work performed under said contract clearly set forth these facts.

In preparation for the performance of the contract, a conveying system was designed and constructed to meet the specific needs and conditions of the project. This system, consisting of 162 separate units, each 105 feet in length, was installed at the excavation site to aid in the removal of excavated dirt and debris. The total cost to petitioner of construction and installation of this system was approximately $1,870,000. Additionally, in the spring of 1968, petitioner installed excavating equipment and other machinery at the project for the purpose of performing the work under the contract. This additional machinery and equipment had a book value of approximately $488,000 at the time it was placed at the project site.

The work called for by the contract proceeded in a successful manner until January 19, 1969, when a severe rainstorm commenced. This storm caused extensive flooding in the San Gabriel Canyon at the site of the project. Rain continued to fall, at various times during the period, from January 19, 1969, up to and including February 25, 1969. The number of separate storms

occurring between those dates has not been adjudicated or otherwise legally determined, and expert opinion relative thereto was in complete disagreement and varied from 2 to 5 storms.

As a direct result of the storm or storms, a substantial part of the equipment and machinery, including many thousands of feet of the conveying system, was buried in mud and debris and damaged thereby. The question of fact as to whether the equipment and machinery sustained all its damage in the storm which commenced on January 19, 1969, and ended January 28, 1969, or sustained additional damage in subsequent storms, was never adjudicated or otherwise legally determined, and expert opinion relative thereto was in complete disagreement.

Petitioner carried flood damage insurance on this machinery and equipment, including the conveying system, with Employers Mutual Fire Insurance Co. (hereinafter referred to as insurance company). The insurance policy contained a schedule of equipment and machinery covered, and a value was designated for each item on the schedule. The policy also contained a provision for coverage of equipment not listed on the schedule if the same was additional or substitute equipment. The policy contained a limit-of-liability clause of $500,000 for any one loss or occurrence.

The fact that the machinery and equipment was severely damaged by flooding and was covered to a depth from 4 to 30 feet by dirt and debris did not limit or terminate petitioner's obligation to perform the contract. Therefore, subsequent to January 19, 1969, after inspecting the flooded area, petitioner decided it was necessary to uncover and repair the buried equipment and machinery in order that the contract could be performed in an economic and timely manner. Petitioner also decided it was necessary to uncover the equipment concurrently with the performance of the contract. Thereafter, the excavation work was commenced at a point as far upstream from the dam as possible, and as it progressed, the excavation moved downstream uncovering buried equipment and removing dirt and debris in one operation. The uncovered units were repaired or replaced and were immediately used to lengthen the conveying system to accommodate the downstream movement of the excavation.

The above decisions were dictated by the following facts: First, the petitioner had no alternate equipment with which to

replace the damaged equipment; second, the buried equipment, including the conveying units, were necessary to the performance of the contract; and third, the excavation performed and paid for under the contract would also uncover the damaged conveying units and other equipment.

Shortly after the last of the January storms abated, petitioner's president, R. R. Hensler, met with a representative of the insurance company at the excavation site. At that time, Hensler estimated that the cost of repairing and replacing the equipment would be approximately $385,000. On or prior to January 31, 1969, the insurance company verbally agreed to compensate petitioner on a contractual basis (cost plus 15 percent) for making repairs and replacements to the damaged equipment. At this time, petitioner did not enter into discussions with the insurance company as to what would happen in the event the restoration costs exceeded $500,000.

Shortly after the storms abated, the work of uncovering, repairing, and replacing the equipment was commenced. At petitioner's request, a representative of the insurance company was placed on the site. As the repair work continued, petitioner would submit a daily voucher covering the cost of that day's repairs to the representative who would sign these vouchers and presumably[3] submit them to the insurance company. The billings, as rendered, were paid to the total sum of $500,000 by the insurer.

On or about April 3, 1969, the insurance company advised petitioner by letter that it considered its liability for damages to the equipment to be limited to $500,000, the limit per occurrence under the policy. This letter was denial of liability of the insurer for any sums in excess of the above amount. Previous to the receipt of this letter, the insurer removed its onsite representative, and invoices submitted to the insurer subsequent to the removal of the representative were not paid. Up until this time, petitioner believed that it would be fully compensated by the insurance company for its damage.

Subsequently, petitioner obtained an attorney to represent it on this matter, and petitioner, through its attorney, began

---

[3]The record before us is incomplete as to what exactly was done with these vouchers after submission to the insurer's onsite representative.

negotiations with the insurance company to discuss the matter of additional liability.

Although the insurance company was denying liability, petitioner continued to repair and replace the damaged equipment as it was uncovered.

By an agreement dated July 1, 1969, petitioner entered into a joint venture with R. L. Mason Construction, Inc., which agreement provided for the assignment by petitioner of all its interest and responsibilities in the San Gabriel Dam Reservoir contract, together with all equipment at the project, to the joint venture for the sum of $1,824,677.81. The respective interests in said joint venture were 90 percent in the petitioner and 10 percent in R. L. Mason Construction, Inc. The parties agreed that the joint venture would receive all funds pertaining to the project, from any source, after July 1, 1969, and that the joint venture would assume full responsibility for any and all obligations pertaining to the project not paid or performed as of July 26, 1969. The obligations, assumed by the joint venture, dictated that all machinery and equipment which had not previously been repaired or replaced would be repaired or replaced at the expense of the joint venture.

The costs incurred for these repairs and replacements were expensed by charging them to costs of operations on the books and account of petitioner and subsequent to July 1, 1969, on the books and account of the San Gabriel Dam joint venture.

For income tax purposes, both petitioner and the San Gabriel Dam joint venture reported income received from the insurer as gross receipts or gross sales, and the cost of repairs and replacements were reported as cost of sales.

Prior to June 30, 1969, expenses incurred and paid by petitioner for the repairs and replacements totaled $620,399.14, and the sum of $315,160.26 that was paid by the insurer to the petitioner prior to that date was included in income. The San Gabriel Dam joint venture incurred costs totaling $757,501.73 for repairs and replacements and received $184,839.74 from the insurer which was credited to income of the venture. Therefore, in the years that are before the Court, the total costs incurred by petitioner and the joint venture amounted to $1,377,900.87, while the amount paid by the insurer amounted to $500,000. The repairs and replacements done by both petitioner and the joint venture did not constitute permanent betterments or improve-

ments to the machinery and equipment, and respondent has not argued that these repair expenses should be capitalized.

On May 2, 1969, petitioner, through its attorney, wrote the insurance company requesting a meeting to discuss settlement of liability in excess of the $500,000 limitation. It was petitioner's contention at that time that each storm occurring between January 19, 1969, and February 26, 1969, was a separate occurrence under the policy, thereby imposing additional liability on the insurer. Negotiations with the insurance company continued, but no agreement was reached.

On or about October 23, 1969, within the 1-year period of limitation established in the insurance contract, petitioner filed a legal action in the United States District Court for the Central District of California against Employers Mutual Fire Insurance Co. for money due on, or arising out of, a contract of insurance. This legal action put in issue the question of whether the insurance company's liability was limited to $500,000 by reason of the limit-of-liability clause contained in the flood damage insurance policy issued to petitioner. The specific facts in issue concerned (1) the number of storms; (2) whether the damage was caused solely by reason of the first storm, or was additional damage suffered in the subsequent storm. Petitioner, as plaintiff in this action, claimed the sum of $1,084,260.28, plus legal interest thereon, as due, owing, and unpaid by defendant, which sum was in addition to the $500,000 which was agreed by the defendant to be covered by the policy.

On March 18, 1971, petitioner filed an amended complaint to the above legal action. This amended complaint included a new cause of action claiming liability of the insurance company was predicated on estoppel. It was petitioner's contention that once the insurer had exercised its option under the policy to have petitioner repair, it was now estopped to deny full liability for those repairs.

This legal action was settled by negotiation and compromise on October 6, 1972, just prior to its ordered trial date. Pursuant to the settlement, the insurance company paid an additional $850,000 which sum was received and accounted for by the San Gabriel Dam joint venture as income from operations and

reported for income tax purposes as gross receipts or gross sales.[4]

Between the time the suit was instituted until the above settlement date, neither petitioner nor its attorney had any intention to drop the suit. Petitioner expended approximately $30,000 in legal fees in pursuing the suit to conclusion.

In his notice of deficiency, respondent determined the repair and replacement expenses were not deductible by either petitioner or the joint venture[5] in any year prior to 1972, the year of recovery. The basis for respondent's disallownace was that prior to that time petitioner had not sustained a loss not compensated by insurance.

## OPINION

The first issue is whether the expenses incurred in uncovering, cleaning, repairing, and replacing the inundated equipment are deductible as ordinary and necessary business expenses under section 162[6] when incurred, or can only be deducted as casualty losses under section 165.[7]

Petitioner claims that the expenses were ordinary and necessary business expenses and are deductible under section 162 regardless of the fact that they also qualify as casualty losses deductible under section 165. In the alternative, petitioner claims that the expenses are deductible in the year paid under section 165 because at the end of the years here involved it had no reasonable prospect of recovering compensation in excess of $500,000.

Respondent argues that these expenses were not ordinary[8]

---

[4]The year of recovery is not before the Court.

[5]The determination of petitioner's deficiency resulted from increasing the taxable income of the joint venture, the distributed share of which was included in the gross income of petitioner.

[6]Sec. 162(a) provides in part:

There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *

[7]Sec. 165(a) provides in part:

There shall be allowed as a deduction any loss sustained during the taxable year not compensated for by insurance or otherwise.

[8]Petitioner argues that respondent did not raise an issue as to whether these expenses were "ordinary" until his opening brief, which is too late and unfair to petitioner. In light of our conclusion herein, we need not address that argument.

While the stipulation of facts uses the words "repairing and replacing" and "making repairs and replacements" in referring to the amounts expended, no issue has been raised by respondent either in the notice of deficiency or his answer, and he has not argued on brief whether a part of the expenses involved were capital in nature rather than repairs, and no effort was made by either party to

and necessary business expenses deductible under section 162 but were casualty losses deductible only under section 165 to the extent not reimbursed by insurance. Respondent also argues that petitioner had a reasonable prospect of recovering its losses from the insurance company up until the time its lawsuit against the insurance company was settled in 1972, a year not before the Court, and hence none of the expenses are deductible in the years before the Court.[9]

Clearly, expenses incurred by reason of casualty may be deducted under section 162 if the expenses in question meet the requirements of that section, i.e., that they are ordinary and necessary expenses paid or incurred in carrying on any trade or business. *Illinois Merchants Trust Co., Executor v. Commissioner,* 4 B.T.A. 103 (1926); *Midland Empire Packing Co. v. Commissioner,* 14 T.C. 635 (1950); *American Bemberg Corp. v. Commissioner,* 10 T.C. 361 (1948), affd. per curiam 177 F.2d 200 (6th Cir. 1949). There is no suggestion in the statutory language or legislative history of section 162 or its predecessors that a business expense may not be deducted under that provision because it is specifically allowable as a deduction under some other section of the Code. See 4A J. Mertens, Law of Federal Income Taxation, sec. 25.01 (1972 rev.).

There is no hard and fast rule as to what constitutes an ordinary and necessary expense and each case must be decided on its own facts. *Welch v. Helvering,* 290 U.S. 111, 115 (1933); *Deputy v. DuPont,* 308 U.S. 488 (1940). As stated in *Welch v.*

---

distinguish between "repairs" and "replacements." Respondent stated in his reply brief: "The issue is not whether section 165 necessarily forecloses the applicability of section 162 but rather whether the facts in the instant case dictate casualty loss treatment under section 165." We have therefore assumed that the words "replacing" and "replacements" referred to either returning an item to its original location or replacing parts of the conveying system or other equipment rather than an entire unit which might have to be capitalized.

[9]In the posture of this case, the ultimate amount of taxes involved is probably small. The issues present only a question of timing of the deductions. Under petitioner's theory, it deducts the expenses currently and includes the insurance recovery in income when received. Under respondent's theory, no amount is deductible and no amount is included in income until the insurance claim is settled and then the insurance recovery is offset against and reduces the amount of the casualty loss that is deductible, if any. Interest due on the deficiencies for the year here involved may be the principal reason for this litigation.

Petitioner's argument for a current casualty loss deduction is alternative only, and neither party addresses the question of whether petitioner may be entitled to both a deduction under sec. 162 and a casualty loss deduction under sec. 165. Nor has petitioner taken the position that the insurance recovery is given consideration only in reduction of the casualty loss. Consequently, we have not considered such issues.

*Helvering, supra,* with reference to the words "ordinary and necessary expense":

Here indeed, as so often in other branches of the law, the decisive distinctions are those of degree and not of kind. One struggles in vain for any verbal formula that will supply a ready touchstone. The standard set up by the statute is not a rule of law; it is rather a way of life. Life in its fullness must supply the answer to the riddle. [290 U.S. 114, 115.]

No dispute is raised as to whether the repairs were "necessary," which has been defined as an expenditure that is appropriate and helpful in the business (*Welch v. Helvering, supra*), as opposed to one that is indispensable or inexorable. The issue resolves itself as to the proper meaning to be given the word "ordinary," when the expense is incurred by reason of a casualty.

"Ordinary" has the connotation of normal, usual, or customary. *Deputy v. DuPont, supra.* However, as said in *Welch v. Helvering, supra:*

Ordinary in this context does not mean that the payments must be habitual or normal in the sense that the same taxpayer will have to make them often. A lawsuit affecting the safety of a business may happen once in a lifetime. The counsel fees may be so heavy that repetition is unlikely. None the less, the expense is an ordinary one because we know from experience that payments for such a purpose, whether the amount is large or small, are the common and accepted means of defense against attack. Cf. *Kornhauser v. United States,* 276 U.S. 145. The situation is unique in the life of the individual affected, but not in the life of the group, the community, of which he is a part. At such times there are norms of conduct that help to stabilize our judgment, and make it certain and objective. * * * [290 U.S. 114.]

Recovering and repairing the equipment buried by the flood waters was directly related to petitioner's business. It could not have carried out its contract without the equipment. And, although neither petitioner nor any other contractor doing the same type of work would expect to have so much of its equipment inundated by a flood, such occurrence was not unique and petitioner had reason to anticipate the possibility of damage to its equipment by flood waters. Its contract even warned of the possibility. We have no reason to think that petitioner's decision to recover and repair the equipment was not a sound business decision or that the method petitioner employed in doing it was unusual or abnormal. And the fact that the expense was large does not change its character.

The question whether an expenditure for repairs is an

ordinary and necessary business expense is often tested in the context of whether the expense was capital in nature (*Commissioner v. Tellier*, 383 U.S. 687, 689 (1966)), and many of the cases cited deal with that aspect of the problem. As heretofore noted, we are not confronted with that issue here. It is stipulated that the expenditures did not constitute permanent benefits or improvements to the machinery and equipment, and there is no reason to believe that the repairs either prolonged the life of the equipment, increased its value, or made it adaptable to a different use.

We conclude that the expenditures here involved were ordinary and necessary and were paid or incurred in carrying on petitioner's business within the meaning of section 162(a).

The next question is whether these expenditures were business expenses deductible under section 162(a) or were losses deductible only under section 165(a). The distinction is important because a business expense is deductible when paid or incurred, while a loss is deductible only when sustained and if not compensated by insurance or otherwise. Also, a loss would normally be measured by the difference between the value of the property before and after the casualty, limited to adjusted basis, and reduced by any insurance recovery (sec. 1.165–7(b)(1), Income Tax Regs.), rather than the cost of repairs or replacements.[10] A loss is not sustained until it is evidenced by closed, completed transactions and fixed by identifiable events occurring in the taxable year; also, a loss is not sustained for purposes of section 165 if, at the close of the taxable year, there is a reasonable prospect of recovery of the loss through insurance or otherwise. Sec. 1.165–1(d), Income Tax Regs.; *Montgomery v. Commissioner*, 65 T.C. 511 (1975).

It has been said that the distinction between losses and expenses has generally been regarded as self-evident (*Holt v. Commissioner*, 69 T.C. 75, 78 (1977)), and that the distinction is found primarily in the nature and occasion of the expenditure. *Hubinger v. Commissioner*, 36 F.2d 724, 726 (2d Cir. 1929), affg. 13 B.T.A. 960 (1928), cert. denied 281 U.S. 741 (1930). However, it

---

[10]Since respondent's position is that no loss was sustained during the years before us, he does not indicate how he would compute the loss, if any, when sustained (presumably in 1972). The value of the equipment after the flooding would be difficult to ascertain and since the equipment was recovered and repaired, its adjusted basis should remain fairly well intact.

must be recognized that in practice this distinction is often difficult to apply.

Respondent argues that if expenses are incurred as a result of a casualty, they are deductible only as losses under section 165. Respondent relies heavily on *Hubinger v. Commissioner, supra.* While there is language in that opinion which supports respondent's argument, we do not find that case to be controlling here, for reasons hereinafter mentioned. If property is lost, destroyed, or abandoned as a result of a casualty, we agree that this gives rise to a loss deductible under section 165. See *Holt v. Commissioner, supra; Buffalo Union Furnace Co. v. Commissioner,* 23 B.T.A. 439 (1931), revd. and remanded on other grounds 72 F.2d 399 (2d Cir. 1934). But if property used in a business is simply displaced and damaged in a casualty and expenditures are made to recover and repair such property for further use in the business in a manner that does not permanently improve or better it or prolong its useful life, we believe such expenditures are business expenses deductible under section 162(a), if ordinary and necessary. *J. F. Wilcox & Sons, Inc. v. Commissioner,* 28 B.T.A. 878 (1933); *Ticket Office Equipment Co. v. Commissioner,* 20 T.C. 272 (1953), affd. 213 F.2d 318 (2d Cir. 1954); *American Bemberg Corp. v. Commissioner, supra.*

On the other hand, if the expenditures improve or better the property, or prolong its useful life, they should be added to the basis of the property and amortized over its useful life. And, if the expenditures are to replace the destroyed property, they should be capitalized and the loss on the destroyed property would be deductible as a loss. *Buffalo Union Furnace Co. v. Commissioner, supra.*

In *Hubinger v. Commissioner, supra,* the taxpayer owned a six-story building which was rented for business purposes. A fire destroyed the tower, roof, sixth floor, and part of the fifth floor. The lower floors were damaged by smoke and water. Taxpayer spent a considerable amount reconditioning the building after the fire. The tower was not rebuilt; no improvements or betterments were made, and the life of the building was not extended. The Board of Tax Appeals did not allow the deduction claimed, either as a necessary expense or as a loss sustained, because there was no proof of the salvage value of the building after the fire. The second Circuit affirmed the Board of Tax

Appeals for the same reason, but in discussing the arguments, said:

In other words, where a loss sufficient to be regarded as within the purview of (a)(4) [losses incurred in a trade or business] or (a)(6) [casualty losses] occurs, it is the occasion rather than the precise kind of reconditioning done that determines whether the particular outlay involves "ordinary and necessary expenses" or "losses." * * * [36 F.2d at 726.]

The Board of Tax Appeals in *Hubinger* seemed to be distinguishing between ordinary and necessary expenses and capital expenditures. It said:

We cannot believe that Congress intended to allow charges against the revenues of a day or year the cost of restoring major parts of income-producing property where the restoration is of such a character as to be useful over a long period of years.

The distinction between maintaining property through repairs necessitated as a result of a casualty * * * , and restoration of a major portion of the property itself, is readily apparent. * * * [13 B.T.A. 964.]

We believe the Court of Appeals was also dealing with this distinction; it pointed out that any excess of the expenses over the allowable losses should be added to the basis of the property.

Most subsequent cases which have relied on *Hubinger* involved repair items which were capital outlays. Implicit in cases decided under similar factual circumstances is the holding that repair expenses are currently deductible as long as the repair involved did not prolong the life of a property, increase its value, or make it adaptable to a different use. The fact that the damage resulted from a casualty was not controlling. The nature of the expense rather than the event that occasioned it was the important factor for consideration. In *Midland Empire Packing Co. v. Commissioner, supra,* the taxpayer owned a meat packing plant. Due to oil seepage caused by underground flowing of oil from a nearby refinery, the taxpayer was forced to oil-proof its basement with additional concrete. The Court found that the repairs did not add value to the building or materially prolong its life and, therefore, allowed the cost as a business expense deduction. This holding made it unnecessary for the Court to consider petitioner's alternative contention that the expenditure was deductible as a business loss, or respondent's argument that any loss suffered was compensated for by insurance or otherwise.

Similarly, in *J. F. Wilcox & Sons v. Commissioner, supra,* the

same argument was again made by respondent. Wilcox was a florist, and the repairs in issue were occasioned by damage done to the glass in his greenhouse by hailstones. Petitioner had insurance coverage. The Court held that the expenses were deductible as ordinary and necessary business expenses. See also *Ticket Office Equipment Co. v. Commissioner, supra;* and *Tampa Electric Co. v. Commissioner,* 12 B.T.A. 1002 (1928), wherein repairs for damages occasioned by fire and hurricane were held to be currently deductible, despite the fact that there was insurance coverage. And in *American Bemberg Corp. v. Commissioner, supra,* a major cave-in resulted in damage to petitioner's plant. To repair the damage and prevent further damage, petitioner incurred extensive drilling and grouting expenses (almost $1 million). The Court held that the expenses, though sizable, were not capital in nature and hence were deductible. See also *Illinois Merchants Trust Co., Executor v. Commissioner, supra; Buckland v. United States,* 66 F. Supp. 681 (D. Conn. 1946).

*Holt v. Commissioner, supra,* cited *Hubinger* in concluding that certain forfeitures were losses rather than business expenses. In that case, the taxpayer was arrested for transporting marijuana, and his car and the marijuana were confiscated. That case merely points up the distinction between the complete loss or destruction of property which gives rise to a loss and the repair of damage to property which is normally considered an expense item.

In this case, we are not faced with the issue of whether the cost of restoration of a building partially destroyed by fire is deductible as a business expense, or as a loss, or whether it should be capitalized, as was before the Court in *Hubinger v. Commissioner, supra.* Nor do we have the issue of whether the cost of replacing property destroyed by flood may be expensed or must be capitalized, as in *Hunter v. Commissioner,* 46 T.C. 477 (1966). The circumstances here are that machinery and equipment used directly in the conduct of petitioner's business was damaged by a flood, and the expenditures were made to recover and repair the equipment for further use in the business. How long the equipment would be used after it was repaired is not apparent from the record, but a major portion of it would apparently be used only to complete the contract, and the repairs did not extend its useful life or improve it over its condition prior

to the flood. Compare *Atlantic Greyhound Corp. v. United States*, 125 Ct. Cl. 115, 111 F. Supp. 953 (1953), wherein the costs of repairing petitioner's buses occasioned by accidents were held to be deductible as business expenses. While the amounts are large, we do not believe that factor is controlling (see *Welch v. Helvering*, *supra*; *American Bemberg Corp. v. Commissioner*, *supra*), nor do we believe that the fact that at least a part of the damage was compensated by insurance is controlling. See *J. F. Wilcox & Sons, Inc. v. Commissioner*, *supra*; *Ticket Office Equipment Co. v. Commissioner*, *supra*. While we assume there may have been a complete replacement of some of the equipment, we have no evidence of that fact, and the distinction between repair and replacement has not been put in issue. Under the circumstances of this case, we conclude that the amount spent by petitioner and the joint venture in repairing the machinery and equipment is deductible as ordinary and necessary business expense under section 162(a).

Our conclusion herein makes it unnecessary for us to address petitioner's alternative contention that if the expenditures are not deductible as ordinary and necessary business expenses, it should be allowed a loss deduction under section 165 for each year that an expenditure was made for repairs.

*Decision will be entered under Rule 155.*