Leon NIGHTINGALE, et al., Plaintiffs-Appellants,

v.

UNITED STATES of America, Defendant-Appellee.

No. 81–4585.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 10, 1982.

Decided Aug. 16, 1982.

Rehearing In Banc Denied Oct. 13, 1982.

Ernest J. Maupin, II, Walther, Key, Maupin, Oats, Cox, Lee & Klaich, Reno, Nev., for plaintiffs-appellants.

Daniel F. Ross, Washington, D. C. (argued), for defendant-appellee; Richard Farber, Washington, D. C., on brief.

---

Before BROWNING, DUNIWAY, and WRIGHT, Circuit Judges.

DUNIWAY, Circuit Judge:

This is an appeal from a judgment for the United States in an income tax refund case. We affirm.

## I. *The Facts.*

The parties stipulated to the facts and the district court embodied the stipulated facts in its findings of fact. The taxpayers are shareholders or representatives of shareholders in Sierra Development Company, a Nevada corporation, which operates a gambling casino in Nevada under the name of Club Cal-Neva. The corporation and its shareholders have elected to be taxed under Subchapter S of the Internal Revenue Code.

The tax year in question is the fiscal year ending June 30, 1973. The claim for refund is for $54,460.00, which is the total "liability" of the casino as of the close of the taxable year for progressive jackpots which had not yet been won by any player. The claim is that the amount shown on the slot machine as the payout if a player hits the progressive jackpot is an accrued liability, and hence deductible, the casino's accounting being on the accrual basis.

The stipulation of facts is detailed. We state only so much of it as is necessary to an understanding of the parties' arguments.

During its fiscal year ending June 30, 1973, Sierra Development Company owned and operated, on its casino floor, progressive slot machines. A progressive slot machine pays fixed amount jackpots when designated combinations of symbols appear; however, a progressive slot machine also pays progressive jackpots which increase in amount from the initial setting of the progressive jackpot indicator in direct proportion to the amount of money put into the machine by customers, and continues to increase until the progressive jackpot is won by a customer, or until the maximum progressive jackpot amount, if any, is reached. A progressive jackpot is won when the required combination of symbols appears on the face of the machine.

As in the case of other slot machines, a gambling establishment, in its discretion, determines the odds for winning a progressive jackpot. There are no restrictions placed on gaming establishments for the setting of odds, provided that there is actually a possibility that the winning combination of symbols can appear on the face of the machine. The theoretical odds on winning a progressive jackpot on progressive machines currently in operation at Club Cal-Neva vary from one chance in 8,000 to one chance in 9,765,625. The longest period during which a progressive slot machine in the Club Cal-Neva has not paid the progressive jackpot is four years and three months. Thus, all of the progressive jackpots which were accrued but unpaid as of June 30, 1973, were subsequently won by customers.

When a progressive slot machine is first placed into service by the gaming establishment, an initial progressive jackpot amount is set on the machine. The amount of the initial setting is completely within the discretion of the gaming establishment, and the initial setting may be zero. In addition, when a customer wins a progressive jackpot, the progressive jackpot amount is reset to an amount within the discretion of the gaming establishment. Under current practice, the amounts to which the progressive jackpots are initially set and reset vary, depending upon the machine, from Fifty Dollars ($50.00) to Seventy-Five Thousand Dollars ($75,000.00).

In September, 1972, the Nevada Gaming Commission adopted Regulation Section 5.110 regulating the use of progressive slot machines by licensed gaming establishments. Subsection 5 of section 5.110, as in effect during the taxable year, required licensed gaming establishments to maintain records which record the amount of the indicated payoff (meter reading) at least once per day. In addition, subsection 5 requires the gaming establishment to maintain supporting documents explaining any reduction in the payoff amount from a previous entry. In accordance with this regulation, Sierra Development Company, during the taxable year, maintained daily rec-

ords of the amounts shown on each progressive jackpot meter. As of June 30, 1973, the total amount of accrued but unpaid progressive jackpots, at 12:00 midnight, was $54,460.00.

A debt incurred in gambling is not enforceable in the Nevada courts. However, pursuant to Section 463.310.4 of the Nevada Revised Statutes, administrative penalties may be imposed against any licensed gaming establishment which wrongfully refuses to pay a progressive slot machine jackpot which has been won by a customer. A casino's license may be limited, suspended, or revoked; and it may be fined, up to $100,000.

Regulation 5.110 of the Nevada Gaming Commission, in effect during 1972–73, provided that no payoff indicator on a progressive machine may be turned back, except when the jackpot is won; and if it reaches a limit, that amount must be retained until it is won; the rate of progression cannot be changed until there is a winner. During the taxable year ending June 30, 1973, the Nevada Gaming Commission had no restrictions on the transferability of the accrued but unpaid progressive slot machine liability on one progressive slot machine to another progressive slot machine.

It was also shown by uncontradicted affidavits that, if a gaming establishment proposed a sale or other disposition of the entire gaming business, the unwritten policy of the Nevada Gaming Control Board and the Nevada Gaming Commission as of June 30, 1973, was to require the buyer to continue the progressive slot machines in play following the sale or other disposition, with the same or greater progressive jackpot amounts as at the time of the sale until the jackpots were won by customers of the buyer.

## II. *The Law.*
### A. *26 U.S.C. section 165(a) and (d).*

The government argues that any deduction of unpaid progressive slot machine totals would have to be taken under the loss provisions of 26 U.S.C. sections 165(a) and (d) and that the claimed deduction did not satisfy the "closed and completed transac-

tion" test of Treasury Regulation sections 165–1(b) and (d). The district court agreed with the government. The argument is that this result is compelled by our decision in *Nitzberg v. C.I.R.*, 9 Cir., 1978, 580 F.2d 357, which negates the contrary implications of *R. R. Hensler, Inc. v. C.I.R.*, 1979, 73 T.C. 168, and *Atlantic Greyhound Corp. v. United States*, Ct.Cl., 1953, 111 F.Supp. 953. We do not agree. In *Nitzberg* we held that the specific rule of 26 U.S.C. section 165(d), that gambling losses could be deducted only to the extent of gambling gains, controlled the general rule that all business expenses could be deducted, 26 U.S.C. section 162(a). This does not settle the question of the relation between section 162(a) and the general section on losses, section 165(a). This issue has not been decided by us, and we do not reach it now.

### B. *26 U.S.C. sections 162(a) and 461.*

The business expense deduction provision of the Internal Revenue Code, 26 U.S.C. section 162(a), provides: "In general.— There shall be allowable as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business...." The time at which a deduction may be taken is stated generally in section 461: "General Rule for Taxable Year of Deduction. (a) General Rule.—The amount of any deduction or credit allowed by this subtitle shall be taken for the taxable year which is the proper taxable year under the method of accounting used in computing taxable income." Section 162(a) is within "this subtitle." The method of accounting used in computing taxable income is laid down in section 446(a) as that "on the basis of which the taxpayer regularly computes his income in keeping his books."

The casino in this case uses the accrual method of accounting. The Regulations say this of the general rule for taxable year of deduction: "Under an accrual method of accounting, an expense is deductible for the taxable year in which all the events have occurred which determine the fact of the liability and the amount thereof can be

determined with reasonable accuracy. . . . While no accrual shall be made in any case in which all of the events have not occurred which fix the liability, the fact that the exact amount of the liability which has been incurred cannot be determined will not prevent the accrual within the taxable year of such part thereof as can be computed with reasonable accuracy. . . ." Treasury Regulation section 1.461–1(a)(2). This test is known as the *all events* test. It is the general test for the taxable year of a deduction for a taxpayer on the accrual method.

The "all events" test has its origin in the language of the Supreme Court in *United States v. Anderson*, 1926, 269 U.S. 422, 46 S.Ct. 131, 70 L.Ed. 347. At issue was the correct year to deduct a tax on munitions manufacturers. The Court said this: "In a technical legal sense it may be argued that a tax does not accrue until it has been assessed and becomes due; but it is also true that in advance of the assessment of a tax, *all events may occur which fix the amount of the tax and determine the liability of the taxpayer to pay it.*" *Id.*, 269 U.S. at 441, 46 S.Ct. at 134. (emphasis supplied) The Regulations require that "all the events have occurred which determine the fact of the liability" and that "the amount thereof can be determined with reasonable accuracy." Treas.Reg. section 461–1(a)(2). We have applied this two step test in our cases. *E.g.*, *Wien Consolidated Airlines, Inc. v. C.I.R.*, 9 Cir., 1976, 528 F.2d 735. For purposes of the argument, we assume, but do not hold, that the requirement of reasonable accuracy of computation is met in this case because the amount that "accrued" within the taxable year is certain and that satisfies the regulation.

It is not true, however, that "all events have occurred which determine the fact of the liability." The one, indispensable such event is the winning of the progressive jackpot by some fortunate gambler. Until that event occurs, no actual liability has been incurred. Gambling being what it is, and gambling odds being what they are, it is entirely possible that no actual liability will ever occur. And if we assume that it is bound to occur some day, there is no way of knowing when that will be. The record shows that it may be four years hence. Moreover, there is no way of knowing when any particular progressive "one armed bandit" will pay off, nor what the amount of that pay off will then be.

*Brown v. Helvering*, 1934, 291 U.S. 193, 54 S.Ct. 356, 78 L.Ed. 725, a case much relied upon by the government here, is closely in point. There, a general agent of five insurance companies reported commissions as income. However, portions of some of these commissions would have to be returned to the insurance companies when customers cancelled policies and received partial refunds of their prepaid premiums. The agent claimed as an accrued liability a portion of the commissions reported in the taxable year. The portion was calculated as the proportion of commissions returned in the previous five years. The deduction was disallowed. The Supreme Court said that "no liability accrues during the taxable year on account of cancellations which it is expected may occur in future years, *since the events necessary to create the liability do not occur during the taxable year.* Except as otherwise specifically provided by statute, a liability *does not accrue as long as it remains contingent.*" *Id.*, 291 U.S. at 200, 54 S.Ct. at 359 (emphasis supplied).

In our case, the casino's liability on each slot machine is contingent. No one can say who will hit the jackpot on that machine, how much it will be when he hits it, or when he will hit it. There are just too many contingencies to permit accrual of the liability as the taxpayers would have us do.

As the Court said in *Brown*, "The liability of Edward Brown & Sons arising from expected future cancellations was not deductible from gross income because it was not fixed and absolute. In respect to no particular policy written within the year could it be known that it would be cancelled in a future year. Nor could it be known that a definite percentage of all the policies will be cancelled in the future years. Experience taught that there is a strong probabili-

ty that many of the policies written during the taxable year will be so cancelled. But experience taught also that we are not dealing here with certainties. This is shown by variations in the percentages in the several five-year periods of the aggregate of refunds to the aggregate of overriding commissions." *Id.*, 291 U.S. at 201, 54 S.Ct. at 360 (footnote omitted).

We allowed no deduction in another case, *World Airways, Inc. v. C.I.R.*, 9 Cir., 1977, 564 F.2d 886. There, we affirmed the decision of the Tax Court and praised its "exhaustive and well-reasoned opinion." The airline was under a statutory obligation to have its planes overhauled after a certain number of flying hours. It had contracts with others who would do the job when the time came to do it. Any purchaser of the aircraft would have to get the maintenance done as it fell due, although not necessarily by the same contractors. The airline claimed a deduction for the accrued cost of future overhauls, calculating the amount in proportion to the hours flown in the taxable year. The Tax Court found that there was no fixed and definite liability because all the operative facts had not yet occurred. It pointed to the possibility that the airline might dispose of the aircraft. *World Airways, Inc.*, 62 T.C. 786 (1974). We affirmed.

In *Brown* and *World Airways*, as in this case, the fact of liability was too contingent to permit accrual.

The second argument used by the Tax Court in *World Airways, Inc.*, the one that it called "perhaps a more compelling reason," can be put to use in the present case. There it was easy to say that the claimed deduction was really a cost to be incurred in gaining future income. The decline in value of the planes was already being taken in depreciation, and the taxpayers were in effect attempting to accelerate future depreciation. In the present case it is apparent that the "accrued" jackpots were benefitting the Club for as long as gamblers were paying for the chance to win them, i.e., until the jackpots were won, and this time extended long beyond the taxable year in

question. The expense to which the club will ultimately be put, when it actually pays the jackpots, is paid only at the end of a period of earnings by the machines that may extend over five or more taxable years.

If the Club were to close its doors and go out of business, then, for all the record shows, it would not owe the jackpots to anybody. This tends to show that there is no present liability. The pulling of the winning combination is most naturally regarded as a condition precedent and not as a condition subsequent. The liability itself is contingent upon a winning pull.

Another factor of some significance is that the jackpots will not be taxable as income to any person until they are won. To allow a deduction for an accrued expense would be to allow a deduction where there will be no corresponding income for perhaps four years or longer. Until then there can be no accrual of income (nor can there be a constructive flow to an as yet unknown future winner on a cash method of accounting).

If we were to rule that the figures on the meters of the slot machines represented accrued liabilities then the way would be open for casinos to overcome the restraints of annual accounting in a perfectly legal way. They could put extra machines on the floor on the last day of the tax year with whatever initial jackpot they chose and with whatever odds they liked. Then they could take a current deduction for the full amount even though payment of the jackpots might not occur for many years. There is no suggestion that anything like this occurred in the present case. It is possible that the IRS could prevent such a scheme through the exercise of its power to force the taxpayer to use an accounting method that clearly reflects income, 26 U.S.C. section 446(b), but even if this is so, we should not interpret the more specific section 446(a) so that it allows something that we hope would be forbidden under section 446(b).

The judgment of the district court is correct, and it is therefore

Affirmed.