PEDRO M. RAMOS AND LOURDES RAMOS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ramos v. Commissioner
Docket No. 13817-78.
United States Tax Court
T.C. Memo 1981-473; 1981 Tax Ct. Memo LEXIS 269; 42 T.C.M. (CCH) 924; T.C.M. (RIA) 81473; August 31, 1981. Luis Medina, for the petitioners. Marion L. Westen , for the respondent. HALL MEMORANDUM FINDINGS OF FACT AND OPINION HALL, Judge: Respondent determined a $ 40,874.47 deficiency in petitioners' 1974 income tax, plus a $ 10,228.87 addition to tax under section 6651(a)[1] for failure timely to file a tax return and a $ 2,043.72 addition to tax under section 6653(a) for disregard of rules and regulations. The issues for determination are: (1) Whether petitioners are entitled to a $ 6,370 business loss resulting from the seizure of a fishing boat by Bahamian authorities; (2) Whether petitioners are entitled to a $ 10,000 embezzlement loss relating to a rice deal in Greece; (3) Whether petitioners are entitled to a $ 21,000 business loss relating to a joint venture involving commodity transactions; (4) Whether petitioners are entitled to a $ 15,000 business *272 loss relating to the attempted establishment of a blood bank in Paraguay; (5) Whether petitioners are entitled to a $ 26,063.70 business loss relating to the production of a Las Vegas floor show; (6) Whether petitioners are entitled to deductions for certain miscellaneous items in amounts greater than those previously allowed by respondent; and (7) Whether petitioners are liable for additions to the tax under section 6651(a) for failure timely to file their 1974 joint tax return and section 6653(a) for disregard of rules and regulations. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Pedro M. ("petitioner") and Lourdes Ramos, [2] husband and wife, resided in Miami, Florida, when they filed their petition. Petitioner completed his medical studies at Havana University in 1956. As a result of Cuba's political situation, petitioner came to the United States in 1959. Thereafter petitioner accepted an intern position in Iowa, followed by a general surgery residency at Mt. Sinai Hospital in Miami. Since completing his residency in 1963, *273 petitioner has resided in Florida. Petitioner became an American citizen in 1964. In addition to his medical practice, petitioner has participated in numerous business ventures. Through the years petitioner has been involved in a kitchen cabinet business, the commodities industry, commercial fishing, commercial blood banks, an exporting business, a travel agency and a hospital construction business. Seizure of the "Viola"
In 1971 and 1972 petitioner purchased two fishing vessels, the Pescador and the Viola. Petitioner used these vessels to enter into a joint venture with a fellow Cuban emigre. Their arrangement provided that petitioner would contribute the use of the vessels in exchange for one-half of the fishing profits. After two unprofitable years, petitioner terminated the joint venture arrangement and sold the Pescador. In 1974 petitioner used the Viola to enter into a new joint venture with Ruben Santana. The terms of this joint venture were similar to the prior one in that petitioner agreed to let Santana use the boat in exchange for one-half of the fishing profits. Sometime in 1974 Bahamian authorities seized the Viola for fishing in the territorial waters *274 of the Bahamas. [3] Shortly after the seizure, petitioner approached his friend, Richard Cabrera, for advice. Cabrera, a seasoned fisherman who had prior encounters with Bahamian authorities, volunteered to go to the Bahamas and investigate the situation. [4] Upon his return, Cabrera reported to petitioner that the Viola had been dismantled and was in generally poor condition. Cabrera advised petitioner that the Viola could not be returned to Miami under her own power but would have to be towed back to Miami. Based on Cabrera's advice and experience, petitioner believed that the boat's state of disrepair coupled with the potential legal costs and impediments in obtaining the vessel warranted its abandonment. Petitioner's adjusted basis in the Viola at the time of abandonment was $ 6,370. $ 10,000 Embezzlement Loss
In 1973 petitioner met Ricardo Ferrera while traveling from New York to *275 Miami. During their conversation, Ferrera and petitioner discovered their mutual interest in the commodities business. Subsequently, Ferrera visited petitioner and outlined a rice venture he was currently undertaking in Greece. Ferrera suggested that petitioner participate in the venture and eventually approached petitioner for a $ 10,000 loan. Ferrera indicated that he intended to use the funds to defray traveling expenses. Petitioner loaned the money to Ferrera on the condition that if the venture were successful petitioner would receive one-half of the profits and, if not successful, Ferrera would personally repay the funds. A friend of petitioner's delivered $ 10,000 in cash to Ferrera on petitioner's behalf. In March 1974 petitioner received a $ 10,000 check drawn on the account of Ricardo and Carolyn Ferrera at Franklin National Bank, New York. Petitioner deposited the check into his account with Southeast National Bank of Coral Way in Miami. Shortly thereafter petitioner's bank notified him that the Ferrera check had been dishonored because the account on which it had been drawn was closed. Petitioner attempted to telephone Ferrera in New York but was informed that *276 his telephone number had been disconnected. To date, petitioner has not heard from Ferrera. Petitioner claimed a $ 10,000 deduction for a "business embezzlement loss" on his 1974 income tax return. Respondent disallowed the deduction because of petitioner's failure to establish his entitlement to the deduction. The Noval Arrangement
In 1973 petitioner met Jose Noval, a Cuban expatriate involved in the exporting and importing of commodities, for the purpose of collaborating on a transaction involving the sale of South American rice to a United States corporation. Petitioner and Noval traveled to New York to consummate the deal but failed to do so due to unforeseen complications. After this aborted business venture, petitioner and Noval became good friends. In 1973 and 1974 petitioner paid Noval $ 21,000 to finance Noval's attempt to orchestrate commodity deals. Pursuant to their arrangement, petitioner would receive the first $ 21,000 of profits derived from the deals arranged by Noval and the two of them would split any additional profits. This arrangement was not memorialized in writing. Noval maintained no books or records of any of his expenditures nor did *277 he supply petitioner with any reports or accountings of the funds. No commodity deals were ever consummated. No partnership returns were filed on behalf of the arrangement between Noval and petitioner. To date, Noval has returned none of the $ 21,000 to petitioner. On his 1974 tax return petitioner claimed a $ 21,000 "business abandonment loss" relating to the arrangement with Noval. Respondent disallowed the entire deduction for lack of substantiation. Paraguayan Blood Bank
In 1969 petitioner formed ABD Plasma and Serum Corporation, a plasma center or blood bank, located in Miami, Florida. Between 1970 and 1972 petitioner and others attempted to establish a similar operation in Nicaragua. A blood bank, Centro Americana De Plasmapheresis, opened in Nicaragua in 1972 with petitioner as a 14 percent shareholder. Petitioner played a central role in the operations of the Nicaraguan corporation. In 1973 petitioner sold his interest in ABD Plasma and Serum Corporation at a profit. As a result of the profitability of the blood banks, petitioner desired to open a new facility in 1974. In searching for a location for this new venture, petitioner looked for a country similar *278 to Nicaragua with respect to the general health of the donor population and in which no other commercial blood bank had yet been established. Petitioner researched the situation and identified three potential markets. Only one of these prospects, Paraguay, had no commercial plasma centers. Having decided on Paraguay as the location for this venture, petitioner contacted a friend, Frank Condon, who traveled frequently to Paraguay. Petitioner requested Condon to arrange a meeting between petitioner and Paraguayan officials. Sometime in August 1974 petitioner, his wife, Condon, Fausto Alvarez [5] and two other associates traveled to Paraguay via Argentina. Once in Paragury, petitioner and his entourage met with a Paraguayan lawyer named "Chapel", [6] the Minister of Health and a Paraguayan financier. Subsequently, Condon and Alvarez made several trips to Paraguay in furtherance of the project. Eventually, petitioner obtained permission from the Paraguayan government to establish a blood bank in that country. Unfortunately, however, petitioner could not arrange for local financing of the project nor could be afford to finance it himself. Despite the inability to immediately finance *279 the operation, petitioner retained a one-year option to proceed with the project. Petitioner subsequently let the option lapse due to the continued lack of financing. Petitioner never established a blood bank in Paraguay. On his 1974 tax return, petitioner claimed a $ 15,000 "business abandonment loss" with respect to his abortive attempt to establish a blood bank in Paraguay. [7] In his statutory notice, respondent disallowed the entire $ 15,000 deduction. Theatrical Production
On his 1974 tax return, petitioner claimed a "business abandonment loss" of $ 26,063.70 relating to the production of a Las Vegas floor show. Respondent *280 disallowed the entire deduction due to lack of substantiation. Miscellaneous Expenses
On his 1974 return, petitioner claimed and respondent allowed the following deductions: Item
Claimed Deduction
Allowed Deduction
Telex, Telephone
$ 8,082.64
$ 5,713.07
and Telegraph
Auto Expenses
2,304.65
1,152.83
Travel and Entertainment
5,540.00
Interest
19,868.00
18,376.93
Miscellaneous
561.85
Additions to the Tax
During 1974 petitioner maintained inadequate books and records. Petitioner signed his 1974 tax return on September 24, 1976, and subsequently filed it with the Internal Revenue Service. In his statutory notice, respondent asserted additions to the tax under section 6651(a) for failure timely to file the tax return and under section 6653(a) for disregard of rules and regulations. OPINION In addition to his medical practice, petitioner participated in a number of financial ventures during 1974. Respondent challenges several of the deductions claimed by petitioner with respect to those ventures. Seizure of the "Viola"
In 1974 petitioner and Ruben Santana, a fisherman, entered into a business arrangement whereby petitioner *281 allowed Santana to use his fishing vessel (the "Viola") in exchange for one-half of the fishing profits. During one of the Viola's fishing expeditions in 1974, it was seized by Bahamian authorities for fishing in the territorial waters of the Bahamas. The boat was dismantled during its dockage in the Bahamas and left in a state of disrepair. Based on the advice and experience of Robert Cabrera, a seasoned fisherman and friend who had prior encounters with Bahamian authorities, petitioner decided to abandon the Viola rather than incur the legal costs necessary to secure repossession of the vessel, the towing fees required to return it to Miami and the cost of refurbishing it. On his 1974 tax return, petitioner claimed a "business casualty loss" equal to his adjusted basis in the Viola, i.e., $ 6,370. In his statutory notice, respondent stated The deduction of $ 6,370.00 claimed as a business casualty loss--confiscation of a boat is disallowed because you have not established that you are entitled to such a deduction. Therefore, your taxable income is increased in the amount of $ 6,370.00 for the year 1974. In his trial memorandum filed at the call of the calendar, respondent *282 indicated two bases for disallowing petitioner's claimed loss. The first involved lack of substantiation and the second relied upon section 162(f). [8] This was the first time respondent had raised section 162(f) as a basis for the disallowance. On brief, respondent's only argument against petitioner's deduction related to section 162(f) and the regulations thereunder. For the reasons stated below, we hold for petitioner on this issue. At the threshold, we reject respondent's attempt in this case to use section 162(f) to disallow petitioner's claimed loss. Throughout this proceeding petitioner has consistently looked to section 165 as the source of his deduction and respondent has consistently challenged the deduction under that section. Respondent now requests this Court to apply section 162(f) to disallow a deduction taken under a different section of the Internal Revenue Code. Section 162(f), however, does not sweep so broadly. By its terms, section 162(f) only disallows those expenses that the otherwise *283 allowable under section 162(a). Consequently, even disregarding respondent's delay in raising section 162(f), [9] it would appear that section 162(f) would have no bearing on petitioner's claimed deduction under section 165. Cf. R.R. Hensler, Inc. v. Commissioner, 73 T.C. 168 (1979) (deduction under section 162 allowed regardless of deductibility under section 165). Section 165(a) allows a deduction for "any loss sustained during the taxable year and not compensated for by insurance or otherwise." In the case of an individual, the deduction is limited to losses incurred in the taxpayer's trade or business or in any transaction entered into for profit, and to certain casualty losses. Sec. 165(c). Petitioner bears the burden of proving he has sustained a deductible loss. Rule 142(a), Tax Court Rules of Practice and Procedure.[10] Although the record is *284 less than ideal on this point, we believe petitioner has sustained his burden. We do not view respondent's position on brief as seriously challenging these facts and we find them supportive of petitioner's entitlement to a business loss deduction. Losses arising from the seizure (or confiscation) of business property are generally deductible absent a showing that such deductions will frustrate a sharply defined national of state policy. See Holt v. Commissioner, 69 T.C. 75 (1977), affd. per curiam 611 F. 2d 1160 (5th Cir. 1980); Fuller v. Commissioner, 20 T.C. 308 (1953), affd. 213 F. 2d 102 (10th Cir. 1954). [11] In this case, neither party has raised nor addressed whether the allowance of petitioner's loss will contravene a sharply defined national policy and, accordingly, we do not address this aspect. Moreover, petitioner's pragmatic decision to abandon the vessel rather than pursue *285 its return does not preclude the deduction. See Hills v. Commissioner, 76 T.C. 484 (1981), on appeal (5th Cir. 1981). In sum, we conclude that petitioner sustained a $ 6,370 loss in 1974 relating to his fishing enterprise. $ 10,000 Embezzlement Loss
On his 1974 tax return, petitioner claimed a $ 10,000 "business embezzlement loss" relating to petitioner's dealings with Ricardo Ferrera. On brief, petitioner has apparently abandoned the embezzlement argument and now asserts that the $ 10,000 represents a business bad debt deduction in 1974. [12] Respondent challenges the deduction due to petitioner's failure to prove the worthlessness of Ferrera's obligation and, we agree. *286 In general, section 166 permits taxpayers to deduct bad debts that become worthless within the taxable year. The determination of the worthlessness of a debt depends on the facts and circumstances in each case. Sec. 1.166-2(a), Income Tax Regs.; Estate of Pachella v. Commissioner, 37 T.C. 347, 353 (1961), affd. 310 F. 2d 815 (3d Cir. 1962). Furthermore, the date of worthlessness is fixed by identifiable events which form the basis of reasonable grounds for abandoning any hopes of recovery. Id. at 353. Petitioner bears the burden of proof on this issue. Rule 142(a). [13]
The facts presented by petitioner do not adequately support his conclusion that the Ferrera debt was worthless in 1974. The record reveals that petitioner received a $ 10,000 check from Ferrera *287 which was subsequently dishonored due to the closing of Ferrera's account and that petitioner's attempts to telephone Ferrera proved futile because the latter's telephone had been disconnected. We find these facts to be inconclusive of the debt's worthlessness. First, the reason why Ferrera's check was dishonored, i.e., the closing of his account, does not necessarily reflect adversely on Ferrera's ability to repay the loan. Second, although petitioner failed to reach Ferrera by telephone, petitioner's testimony at trial reveals that at least two of his friends were also acquaintances of Ferrera. There is no evidence in the record that petitioner enlisted the help of his friends or anyone else to locate Ferrera. Furthermore, there is no evidence of other efforts made by petitioner to contact Ferrera. Given the amount of money involved, it is surprising that petitioner would so easily give up on locating him. At trial, petitioner testified that he pursued no legal action against Ferrera because (1) he did not know where Ferrera lived, (2) he would have to institute legal proceedings in a foreign forum (New York), (3) the expense of hiring a lawyer would probably exceed any *288 recovery and (4) Ferrera might not have the money to repay. Some of these statements are pure speculation and are uncorroborated. There is no evidence in the record of the nature and extent of petitioner's effort to contact Ferrera besides telephoning a disconnected number nor is there any evidence of petitioner contacting an attorney regarding his legal rights and the cost of asserting them. In sum, petitioner has presented insufficient evidence from which we can formulate an independent opinion as to the collectibility of the Ferrera debt. See Estate of Pachella v. Commissioner, supra at 353. The Noval Arrangement
On his 1974 tax return, petitioner claimed a $ 21,000 "business abandonment loss" relating to an arrangement between himself and Jose Noval, a commodities dealer, whereby petitioner supplied funds to finance Noval's attempt to put together commodity deals. Petitioner contends that the arrangement constituted a joint venture and that the $ 21,000 represented his investment in it. Petitioner further contends that the joint venture was a complete failure and, as a consequence, he sustained a $ 21,000 business loss. On the other hand, respondent *289 questions the nature of the arrangement between petitioner and Noval and, in any event, asserts that petitioner has failed to sustain his burden of proof with respect to this deduction. Although the nature of the arrangement is not entirely clear from the evidence presented, [14] we will assume for purposes of this opinion that petitioner's characterization is correct. Nonetheless, we conclude that he has failed to establish his entitlement to the loss in 1974. Section 165 provides that: (a) General Rule.--There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. (b) Amount of Deduction.--For purposes of subsection (a), the basis for determining the amount of the deduction for any loss shall be the adjusted basis provided in section 1011 for determining the loss from the sale of other disposition of property. *290 Petitioner must prove the amount of his loss and that it occurred during the taxable year in which the deduction is claimed. Rule 142(a). The sole basis for petitioner's claimed deduction is the unsupported representation made by Noval that the venture failed. Noval failed to maintain any records or accountings of how he expended the $ 21,000. At trial, Noval provided no details as to his expenditures; instead his testimony was vague and inconsistent. [15] Under these circumstances, Noval's bald assertion that the entire venture was a flop simply will not suffice to sustain petitioner's burden of proving that all, or any part, of the $ 21,000 was expended and, hence, lost. Moreover, even if we were satisfied that the entire $ 21,000 was expended and lost, the record is completely devoid of evidence pinpointing the taxable year in which such loss was sustained. Paraguayan *291 Blood Bank
This issue relates to the deductibility of certain legal and travel expenses pertaining to petitioner's abortive attempt to establish a blood bank in Paraguay. Petitioner claims that he is entitled to a $ 15,000 business loss for amounts expended before the planned venture was abandoned. Respondent, on the other hand, contends that petitioner has failed to substantiate his entitlement to this deduction and we agree. Initially, we recognize that the deductibility of preliminary or investigatory expenditures relating to prospective businesses often raises thorny issues as to whether the taxpayer is currently engaged in the trade or business, whether such expenditures were incurred in that trade or business, or whether such expenditures were incurred in a transaction entered into for profit. Sections 162(a), 165(c)(1) and 165(c)(2). See O'Donnell v. Commissioner, 62 T.C. 781, 785-786 (1974), affd. without published order (7th Cir., July 23, 1975); Seed v. Commissioner, 52 T.C. 880 (1969); Frank v. Commissioner, 20 T.C. 511 (1953). *292 [16] Under any of the above theories, the taxpayer must still prove the amount expended on the prospective business. Rule 142(a). Because petitioner has failed to prove the amount expended on the Paraguayan blood bank project, we need not address the question of which of the aforementioned Code provisions, if any, are applicable.[17]
In support of his claimed deduction, petitioner introduced two cancelled checks drawn on his expense account with Southeast National Bank of Coral Way. The first check, dated December 3, 1974, is for $ 7,000 and made payable to S. Hompanera, Inc. The second check, dated December 17, 1974, is for $ 8,000 and made payable to *293 "Cash." [18] Petitioner testified that the $ 7,000 check was given to Frank Condon, a friend of petitioner's who frequently traveled to Paraguay, to pay for the legal fees associated with the Paraguay project. There is, however, no explanation in the record as to the relationship between the Paraguayan lawyer referred to by petitioner as "Chapel" [19] and the payee of the check "S. Hompanera, Inc." Furthermore, there is no bill or other evidence indicating the amount of the legal fee incurred in the Paraguay project. Petitioner's failure to demonstrate how a check payable to "S. Hompanera, Inc." satisfied a fee charged by a lawyer named "Chapel" or that the amount of such check equals the legal fee charged by the Paraguayan lawyer, simply leaves too great an evidentiary gap for us to fill with speculation. With respect to the $ 8,000 check, petitioner testified that the proceeds were used to *294 reimburse Fausto Alvarez, his accountant and business associate for expenses incurred in traveling to Paraguay. Although Alvarez testified that petitioner reimbursed him for his expenses, his testimony did not reveal how much those expenses were nor did he testify that he received an $ 8,000 payment from petitioner at any time. Alvarez's failure to mention receipt of the $ 8,000 coupled with the cash nature of the check makes us hesitant to attribute the funds to the Paraguay project. Furthermore, the expenses for which petitioner purportedly reimbursed Alvarez are not delineated or documented. Alvarez testified that he merely told petitioner how much he spent and was reimbursed for that amount. Under these circumstances we simply cannot find that petitioner had sustained his burden of proving that the $ 8,000 was expended on the Paraguay project. In addition to the two cancelled checks, petitioner also introduced a credit care receipt for a Paraguayan hotel bill, a hotel bill for a Sheraton Hotel in Argentina, and two airline tickets representing a round-trip from Miami to Paraguay in Alvarez's name. [20] We do not believe that these additional items aid petitioner's cause. *295 First, the credit card receipt for the hotel in Paraguay is in Alvarez's name and reflects the currency of Paraguay. Even if we presume the hotel bill relates to one of Alvarez's travels on behalf of the Paraguay project and that petitioner reimbursed him for that expense, we do not know the amount of the bill. Petitioner introduced no evidence as to the exchange rate for translating Paraguayan currency into United States dollars. Second, the hotel bill for the Buenos Aires-Sheraton Hotel reflects the charges incurred by Mr. and Mrs. Alvarez, Mr. and Mrs. Condon and Garcia Ciro, a business associate of petitioner's, during a 10-day period from August 4 through August 11, 1974. At trial petitioner testified that he, Alvarez, Condon and two associates including Ciro traveled to Paraguay via Argentina. Even assuming petitioner paid for the travel expenses of the entire group, we do not believe the expenses reflected in the Sheraton Hotel bill were primarily related to the Paraguay project. [21] No evidence was introduced explaining why the group needed to stay in Argentina for 10 days when the purpose of the trip was to investigate the prospects of forming a blood bank in Paraguay. *296 We surmise that the trip was not all business. [22] Third, the connection between the airline tickets and the Paraguay project is similarly attenuated. [23]
In sum, the evidence presented does not adequately substantiate petitioner's claimed expenditures relating to the Paraguay project. Even if we were to find that petitioner was in the trade or business of operating blood banks, see note 17, supra, and that he expended $ 15,000 on the Paraguay project, we would still be unable to permit petitioner's deduction for 1974. The record is devoid *297 of any evidence as to when the project was abandoned. The project began sometime in August 1974. Subsequently, Condon and Alvarez visited Paraguay several times, evidently to obtain a permit and to obtain local financing. The record does not reveal the time frame of these subsequent trips nor of the financing negotiations. Petitioner did, however, obtain a permit to operate the blood bank. The rights associated with petitioner's permit required him to establish the business within one year or else forfeit the permit. It was only after the expiration of the one-year period that petitioner abandoned the Paraguay project. In light of these facts, petitioner's abandonment could not have occurred in 1974 and, consequently, he is not entitled to a section 165(c) loss in that year. [24]
Theatrical Production
Petitioner claimed a $ 26,063.70 "business abandonment loss" on his 1974 tax return. In support of this deduction, petitioner testified *298 that he invested this amount in the production of a Las Vegas floor show. According to petitioner, he transferred approximately $ 26,000 to Julio Diaz, a Mexican political figure, in 1974 for the purpose of financing a theatrical production to be choreographed by petitioner's friend, Robert Hulideros, a Cuban-born choreographer then living in Mexico. Petitioner further testified that Diaz disappeared with $ 15,000 after spending the difference on the production. No show was ever produced nor has petitioner heard from Diaz. Based on these events, petitioner contends that he suffered a business loss under section 165. Respondent maintains that petitioner has failed to meet his burden of proving that any deductible loss was sustained in 1974, and we agree.
Section 165(a) provides that there shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. The loss must be evidenced by closed and completed transactions and fixed by identifiable events occurring in such taxable year. Sec. 1.165-1(d)(1), Income Tax Regs. *299 Petitioner bears the burden of proving all elements of his claimed loss. Rule 142(a). In the present case, all we have is petitioner's vague and unsubstantiated testimony that he suffered a loss financing a theatrical production. Petitioner introduced none of the books or records of the production nor other documentary evidence indicating whether such a venture was ever undertaken and, if so, what amounts were expended. Petitioner produced two witnesses, Jose Espinales and Fausto Alverez to corroborate petitioner's testimony that he transferred approximately $ 26,000 to Diaz in 1974. At trial, petitioner testified that he requested a Nicaraguan corporation, Centro Americana de Plasmapheresis, in which he was a shareholder to transmit approximately $ 26,000 of his dividends directly to Diaz. Espinales, an accountant for the Nicaraguan corporation, testified that he transmitted approximately $ 26,000 on petitioner's behalf in 1974 to the account of J. Diaz. We find Espinales' testimony incredible. Espinales' testimony at trial was inconsistent with an affidavit signed on May 2, 1979, in which he stated that the transfer in question was sent to the order of "the City of Mexico *300 D.F." Furthermore, after observing Espinales' demeanor at trial, we find his specific recall of this $ 26,000 to be suspicious. This is especially so in light of the passage of six years and the multitude of accounting entries and money transfers Espinales handled in his position with the Nicaraguan corporation. [25] Espinales offered no records, advices, receipts or other documentary evidence supporting his testimony. Alvarez, petitioner's personal accountant and controller of Centro Americana de Plasmapheresis, testified that he instructed Espinales to transmit the $ 26,000 to Diaz on petitioner's behalf. Alverez's testimony discloses none of the details surrounding the transfer nor did he present any documentary evidence regarding it. It general, we attach little, if any, weight to Alvarez's testimony. Even assuming funds were transferred to Diaz, the transfer alone would not substantiate the amount and timing of petitioner's loss. Moreover, the transfer in question did not necessarily have to relate to the theatrical production. In light *301 of the absence of any credible corroborative evidence of the theatrical production, the amount involved, or the nature and timing of the expenditures, we find that petitioner's vague testimony is not sufficient enough to carry his burden on this issue. Miscellaneous Expenses
The following table represents miscellaneous deductions claimed by petitioner on his 1974 tax return and the amount of those deductions allowed by respondent: Item
Claimed Deduction
Allowed Deduction
Telex, Telephone
and Telegraph
$ 8,082.64
$ 5,713.07
Auto Expenses
2,304.65
1,152.83
Travel and Entertainment
5,540.00
0
Interest
19,868.00
18,376.93
Miscellaneous
561.85
0
At trial, petitioner introduced partial and summary worksheets prepared by his accountant to substantiate the claimed deductions. These worksheets, by themselves, are not sufficient to sustain petitioner's burden of proof. Rule 142(a). Without some documentation or testimony supporting the worksheets we cannot say that the amounts reflected have been expended by petitioner or that they have been expended for a deductible purpose. Under the circumstances, we cannot find that petitioner is entitled *302 to greater deductions than those previously allowed by respondent. Furthermore, with respect to the $ 5,540 travel and entertainment deduction, petitioner has presented no evidence indicating his compliance with the specific substantiation requirements of section 274(d). See sec. 1.274-5, Income Tax Regs.
Additions to the Tax
In his notice of deficiency, respondent asserted additions to the tax under section 6651(a) for petitioner's failure timely to file his tax return and under section 6653(a) for disregard of rules and regulations. Petitioner bears the burden of proof on both of these issues. See Bixby v. Commissioner, 58 T.C. 757, 791 (1972) (section 6653(a)); Fischer v. Commissioner, 50 T.C. 164, 177 (1968) (section 6651(a)). Petitioner filed his 1974 tax return in September 1976 well past the due date of April 15, 1975. The record contains no evidence of the granting of any filing extensions; nor has petitioner introduced any evidence that his failure to file timely was due to reasonable cause. See Fischer v. Commissioner, supra at 177. *303 Consequently, petitioner is liable for the addition to tax under section 6651(a).
Section 6653(a) provides for an addition to tax of 5 percent of the "underpayment" where any part of such underpayment is due to negligence or intentional disregard of rules and regulations. We have held that the negligence penalty may be assessed in addition to the failure to timely file penalty, Robinson's Dairy, Inc. v. Commissioner, 35 T.C. 601, 609 (1961), affd. 302 F. 2d 42 (10th Cir. 1962), provided it has not been established that respondent relied solely on the circumstances of unaggravated late filing without reasonable cause to apply the negligence penalty. [26]
In the present case we have been repeatedly confronted with the inadequacy of petitioner's books and records. This lax attitude on petitioner's behalf is in direct *304 conflict with the mandate of section 6001 and the regulations thereunder. Petitioner has offered no evidence explaining the inadequacy of his records and, accordingly, we find him liable for the negligence penalty under section 6653(a). See Gilman v. Commissioner, 72 T.C. 730, 751 (1979). To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect during the year in issue.↩
2. Lourdes Ramos is a petitioner solely by virtue of having filed a joint return with her husband.↩
3. As captain of the boat, Santana was placed in jail. ↩
4. Previously, Cabrera experienced the seizure of one of his boats by Bahamian officials. Cabrera hired a Bahamian lawyer and eventually secured the release of his vessel, but by that time it had been dismantled beyond use.↩
5. Fausto Alvarez is petitioner's accountant and business associate. ↩
6. At trial, petitioner could not recall the exact spelling of the lawyer's name.↩
7. On his return, petitioner specifically listed $ 8,000 as his loss from the blood bank venture. The additional $ 7,000 was included in petitioner's claimed abandonment loss relating to his commodities business. At trial and on brief, petitioner asserts that the $ 7,000 should now be included with the claimed blood bank loss and not with the loss derived from his commodities business.↩
8. Section 162(f) provides: No deduction shall be allowed under subsection (a) for any fine or similar penalty paid to a government for the violation of any law.↩
9. Of course, by raising this issue for the first time in his trial memorandum filed at the call of the calendar, respondent would bear the burden of proof. Rule 142(a), Tax Court Rules of Practice and Procedure.↩
10. Unless otherwise indicated, any reference to "Rules" shall be deemed to refer to the Tax Court Rules of Practice and Procedure.↩
11. See also Lafayette Extended Care, Inc. v. Commissioner, T.C. Memo. 1978-233 (1978); Howse v. Commissioner, T.C. Memo. 1974-225↩ (1974).
12. Even assuming petitioner has not abandoned his embezzlement theory, the record will not support a finding that Ferrera embezzled the $ 10,000. Petitioner specifically testified that he lent Ferrera the $ 10,000. Nowhere in the record is there a scintilla of evidence that Ferrera misappropriated the funds.↩
13. Regardless of whether the debt owing to petitioner is a business or nonbusiness debt, petitioner must still prove its worthlessness. Consequently, we do not reach the merits of petitioner's assertion on brief that the debt is business-related.↩
14. At one point in his testimony Noval refers to the $ 21,000 as a personal loan. This is inconsistent with other references in the record to the $ 21,000 as an investment in the joint venture.↩
15. For example, on direct examination Noval testified that the funds were used to defray traveling and telephone expenses. Yet on cross-examination he admitted that a portion of the funds were used by Alper, Inc., his wholly-owned corporation, to purchase commodities and to ward off bankruptcy.↩
16. See also Bick v. Commissioner, T.C. Memo. 1978-390↩ (1978). 17. Petitioner's position on his tax return and on brief presupposes that any expenditure relating to the Paraguayan blood bank project would be deductible under section 165(c)(1). It is arguable, however, that petitioner's activities with the blood bank in Miami and Nicaragua do not suffice to qualify him as being in the trade or business of operating blood banks. See O'Donnell v. Commissioner, 62 T.C. 781, 785-786↩ (1974).
18. Both checks were signed by Coralia Verials, presumably an employee of petitioner's. The $ 7,000 check was endorsed by S. Hompanera, Inc. for deposit only in the Bank of Miami. The $ 8,000 check was endorsed "Coralia Verials--Cashed for Pedro M. Ramos." ↩
19. See note 6, supra↩.
20. According to the tickets, Alvarez left Miami on August 3, 1974, and returned on August 12, 1974. ↩
21. The Sheraton Hotel bill presents a further problem of being quoted in Argentinian currency. Again, petitioner offered no evidence of the applicable exchange rate. ↩
22. We find it strange that none of the bills presented reflect petitioner's presence with the group. ↩
23. In comparing the departure and arrival dates on the airline tickets with the Sheraton Hotel bill, it appears that all of Alvarez's time was spent in Argentina. Furthermore, there is no evidence that petitioner reimbursed Alvarez for the airline tickets.↩
24. Petitioner has never asserted that his expenditures are currently deductible under section 162(a). See note 17, supra↩. Accordingly, his entitlement to a 1974 deduction hinges on his proving the claimed loss occurred in 1974.
25. At trial, Espinales denied having any prior discussions concerning his testimony with petitioner or petitioner's attorney.↩
26. See Estate of Haseltine v. Commissioner, T.C. Memo. 1976-278↩ (1976). In this case, respondent relied on petitioner's failure to maintain adequate books and records to support his assertion of the negligence penalty.