T.C. Memo. 2018-11

UNITED STATES TAX COURT

MARION J. WELLS, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 13889-14.                    Filed January 31, 2018.

<u>Steven R. Anderson</u>, <u>Briana J. Fehringer</u>, and <u>Brian F. Huebsch</u>, for petitioner.

<u>Miles B. Fuller</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

PARIS, <u>Judge</u>: By notice of deficiency issued pursuant to section 6212(a),[1] respondent determined deficiencies in petitioner's Federal income tax of $66,178

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1986 as amended, and all Rule references are to the Tax Court Rules of Practice and Procedure.

**[*2]** and $9,802 for 2010 and 2011, respectively. In the notice of deficiency respondent also determined that petitioner is liable for a section 6662 accuracy-related penalty of $13,235.60 for 2010.

The issues for decision are: (1) whether petitioner may immediately deduct expenditures under section 162 totaling $199,031 and $47,630 for 2010 and 2011, respectively, and (2) whether petitioner is liable for an accuracy-related penalty under section 6662(a) for 2010.

FINDINGS OF FACT

Petitioner was a highway project engineer for the Colorado Department of Transportation until she retired in 1996. She owns and lives on a 265-acre property in Garfield County, Colorado. Petitioner has lived on the property continuously since 1983. Before that she had lived on the property intermittently since 1965 (her father owned the property before petitioner).

Petitioner cultivates approximately 700 white French hybrid rind grapevines on three patches of open land at the northern end of the property. In better years the vines produced up to four tons of grapes, which petitioner would sell to a local winery. More recently petitioner has harvested only 600 to 1,200 pounds of grapes per year because adverse weather conditions (and bears, apparently) have caused damage to her harvest. As her harvest has dwindled, petitioner has taken to

[*3] crushing her grapes for juice, which she sells in gallon jugs to local buyers. Petitioner also leases a portion of the southern part of the property for horse and cattle grazing, although droughty weather conditions during parts of the year have limited the number of animals she is able to graze on the land. Petitioner reported $305 and $255 of gross income from farming for 2010 and 2011, respectively, on Schedules F, Profit or Loss From Farming, attached to her returns for 2010 and 2011. Petitioner reported total farming expenses of $208,265 and $54,734 for 2010 and 2011, respectively.

There is a spring in the southern part of petitioner's property. In 1965 petitioner's father installed an underground pipe to carry water from the spring to other areas of petitioner's property (spring line). The spring line runs downhill from south to north for about 3,800 feet and supplies, among other things, the grazing pasture and an irrigation system in the fields where petitioner grows grapes. The spring line was originally constructed of 2-inch black polyethylene pipe (black pipe), but at least 1,800 feet of the spring line was replaced in 2010 with 2-inch blue pure-core pipe (blue pipe). Sections of black pipe are connected with joints that fit together and are then secured with a hose clamp. Sections of blue pipe are connected with compression fittings and can withstand higher pressures. Blue pipe is more expensive, higher quality pipe.

**[\*4]**  Various roads, both public and private, traverse and border the property. See infra appendix Exhs. 17-P, 23-R.  One of the private roads runs from petitioner's father's house in the north to above the spring in the south (access road).  Another private road runs from the county road in the east to the access road (Kuiper Road).  Additionally, the "Stubbs Pad", an oil or gas site, sits to the south of petitioner's southern property line on a neighboring property (and above the spring in terms of elevation).[2]

2010 Expenditures

In 2010 petitioner hired Robert Schwartz to perform work on her property. Petitioner paid Mr. Schwartz $198,207 for labor, equipment, and materials costs relating to various projects in 2010.  The projects included:  work on, or relating to, petitioner's private roads; work on the spring line; digging holes for new grape vines; spreading manure; and construction of a storage yard.  Mr. Schwartz provided petitioner invoices listing the work completed and the costs.

---

[2]Over the course of several years petitioner made a variety of complaints to the operator of the Stubbs pad, to the Energy Advisory Board, and to the Colorado Oil and Gas Commission alleging, among other things, that the operator of the Stubbs pad site was not properly handling runoff from the site.  The records of these three entities, however, contain no mention of a 2010 flood of water from the Stubbs pad.  Petitioner alleges that a 2010 flood occasioned many of the 2010 expenditures described below.

**[*5]** Also in 2010 petitioner hired Mead Fencing to reset fences that had to be removed to complete work on the spring line and the storage yard. Petitioner paid $824.30 for the fencing work.

Petitioner timely filed her 2010 Form 1040, U.S. Individual Income Tax Return, reporting adjusted gross income of $1,282,990 and total tax of $316,689. In the notice of deficiency, respondent determined that none of the 2010 expenditures discussed above are deductible under section 162. Respondent allowed an increase in a depreciation deduction and section 179 expense of $9,952 for 2010.

2011 Expenditures

In 2007 a wildfire burned approximately 26 acres of the property (burn area). Before the fire, petitioner used a small part of that land for grazing. In 2011 petitioner determined--after consulting a friend who had experience restoring burned land--that the fire had rendered the land hydrophobic, i.e., the heat of the fire had decreased or destroyed the land's capacity to absorb water. Petitioner hired Mr. Schwartz to remove burned tree stumps and boulders and turn the soil so that the entire 26-acre area could be used for forage. Petitioner paid Mr. Schwartz $47,630 to rehabilitate the burn area in 2011. Mr. Schwartz again provided petitioner invoices listing the work completed and the costs.

**[\*6]** Petitioner timely filed her 2011 Form 1040, reporting adjusted gross income of $1,000,078 and total tax of $261,326. In the notice of deficiency, respondent determined that the 2011 expenditures discussed above must be capitalized rather than deducted immediately. Respondent allowed an increase in a depreciation deduction and section 179 expense of $21,289 for 2011.

Petitioner, who is a resident of Colorado, filed a timely petition contesting the notice of deficiency.

OPINION

The Commissioner's determinations in a notice of deficiency are generally presumed correct, and the taxpayer bears the burden of proving by a preponderance of the evidence that those determinations are erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).[3]

I. Capital Expenditures v. Current Deductions

Section 162 permits taxpayers to currently deduct the costs of ordinary and necessary expenses (including incidental repairs) that neither materially add to the value of property nor appreciably prolong its life but keep the property in an ordinarily efficient operating condition. See sec. 1.162-4, Income Tax Regs. In

---

[3]Petitioner filed a motion to shift the burden of proof under sec. 7491(a). The Court will deny petitioner's motion in an order released concurrently with this opinion.

**[\*7]** contrast, section 263 requires taxpayers to capitalize costs incurred for permanent improvements, betterments, or restorations to property; in general, a taxpayer must capitalize expenditures that add to the value or substantially prolong the life of the property or adapt the property to a new or different use. Sec. 1.263(a)-l(b), Income Tax Regs.

Deductions under section 162 are exceptions to the norm of capitalization. INDOPCO. Inc. v. Commissioner, 503 U.S. 79, 84 (1992). An income tax deduction is a matter of legislative grace; the taxpayer bears the burden of proving its right to a claimed deduction. Rule 142(a); Welch v. Helvering, 290 U.S. at 115.

"Whether an expense is deductible or must be capitalized is a factual determination." Norwest Corp. v. Commissioner, 108 T.C. 265, 280 (1997). "Courts have adopted a practical case-by-case approach in applying the principles of capitalization and deductibility." Id. (citing Wolfsen Land & Cattle Co. v. Commissioner, 72 T.C. 1, 14 (1979)). "The decisive distinctions between current expenses and capital expenditures 'are those of degree and not of kind.'" Id. (quoting Welch v. Helvering, 290 U.S. at 114).

In Ill. Merchs. Tr. Co. v. Commissioner, 4 B.T.A. 103, 106 (1926) (cited with approval by United States v. Wehrli, 400 F.2d 686, 689 (10th Cir. 1968)),

[*8] which involved the cost of shoring up a wall and repairing a foundation needed to prevent a building from collapsing, the Board of Tax Appeals drew the following distinctions:

> To repair is to restore to a sound state or to mend, while a replacement connotes a substitution. A repair is an expenditure for the purpose of keeping the property in an ordinarily efficient operating condition. * * * Expenditures for that purpose are distinguishable from those for replacements, alterations, improvements or additions which prolong the life of the property, increase its value, or make it adaptable to a different use. The one is a maintenance charge, while the others are additions to capital investment which should not be applied against current earnings. * * *

"An asset need not be completely out of service or in total disrepair for the general plan of rehabilitation doctrine to apply." Norwest Corp. v. Commissioner, 108 T.C. at 280.

The U.S. Court of Appeals for the Tenth Circuit, to which this case is appealable absent a stipulation to the contrary, see sec. 7482(b)(1)(A), has "evolved what may be called the 'one-year' rule of thumb, under which an expenditure should be capitalized 'if it brings about the acquisition of an asset having a period of useful life in excess of one year or if it secures a like advantage to the taxpayer which has a life of more than one year'", Wehrli, 400 F.2d at 689 (quoting Hotel Kingkade v. Commissioner, 180 F.2d 310, 312 (10th Cir. 1950), aff'g 12 T.C. 561 (1949)). The Court of Appeals has cautioned, however, that the

**[*9]** one-year rule was "intended to serve as a mere guidepost for the resolution of the ultimate issue, not as an absolute rule requiring the automatic capitalization of every expenditure providing the taxpayer with a benefit enduring for a period in excess of one year." Id. Moreover, the Court of Appeals, id. at 689-690, has

> superimposed * * * an overriding precept that an expenditure made for an item which is part of a 'general plan' of rehabilitation, modernization, and improvement of the property, must be capitalized, even though, standing alone, the item may appropriately be classified as one of repair. * * * Whether the plan exists, and whether a particular item is part of it, are usually questions of fact to be determined by the fact finder based upon a realistic appraisal of all the surrounding facts and circumstances, including, but not limited to, the purpose, nature, extent, and value of the work done, e.g., whether the work was done to suit the needs of an incoming tenant, or to adapt the property to a different use, or, in any event, whether what was done resulted in an appreciable enhancement of the property's value. [Fn. ref. omitted.]

## II. The Parties' Arguments

The parties agree that the primary issue before the Court is whether the 2010 and 2011 expenditures may be deducted under section 162. Respondent has not asserted (1) under section 183 that petitioner's farming activities were not engaged in for profit or (2) that petitioner did not pay the costs listed on the invoices in the appropriate years, and the Court therefore does not consider any such issues.

**[\*10]** Petitioner argues that all of her expenditures are deductible under section 162 as repairs. Respondent argues that none of the expenditures is deductible under section 162 either because the expenditures are personal under section 262, or because the expenditures must be capitalized under section 263.

III. Petitioner's Case

As the principal pieces of evidence in support of her case, petitioner provided (1) her testimony, (2) invoices from Mr. Schwartz describing the work he performed on her property in 2010 and 2011 (and two invoices from Mead Fencing describing associated work in 2010), and (3) an allocation document for the 2010 expenses.

There are six invoices from Mr. Schwartz listing expenditures made in 2010, two of which are composed of two separately numbered sheets. In keeping with the convention adopted by the parties, the Court will refer to these as Invoice 7100, Invoice 7101-7102, Invoice 7112, Invoice 7113, Invoice 7114-7115, and Invoice 7116. Each of the invoices contains a description of several different projects and concludes with the total costs of materials, equipment, and labor used for the projects listed on the invoice. The costs listed at the end of each invoice, however, are not allocated among the various projects listed. For example, each invoice lists only the aggregate labor cost for all of the work listed; the total labor

**[\*11]** cost for each invoice is not broken down to reflect the amount of labor cost for each individual project. Additionally, most of the projects span more than one invoice. For example, work relating to the spring line appears on all of the invoices.

Petitioner prepared the allocation document in anticipation of trial and offered it to supplement her testimony. Petitioner testified that the figures on the allocation document represent her estimates of how the costs on each invoice should be divided among the various projects listed on each invoice. The allocation document lists a series of project categories, estimates relating to each project category, and the invoices to which each estimate relates.

Petitioner argues that, if the Court finds that some of her 2010 expenditures are not deductible under section 162, then the Court should estimate, under the so-called Cohan rule, an amount for each project that would be deductible under section 162. See Cohan v. Commissioner, 39 F.2d 540, 544 (2d Cir. 1930). Petitioner contends that the documents just described provide a sufficient basis for estimation. While it is true that "a court should allow the taxpayer some deductions if the taxpayer proves he is entitled to the deduction but cannot establish the full amount claimed", Edelson v. Commissioner, 829 F.2d 828, 831 (9th Cir. 1987), aff'g T.C. Memo. 1986-223, "the Cohan rule does not 'require that

**[\*12]** such latitude be employed'", <u>Norgaard v. Commissioner</u>, 939 F.2d 874, 879 (9th Cir. 1991) (quoting <u>Williams v. United States</u>, 245 F.2d 559, 560 (5th Cir. 1957)), <u>aff'g in part, rev'g in part</u> T.C. Memo. 1989-390. "[T]o qualify for the estimation treatment under <u>Cohan</u>, the taxpayer must establish that he is entitled to some deduction." <u>Id.</u> (citing <u>Edelson v. Commissioner</u>, 829 F.2d at 831); <u>Vanicek v. Commissioner</u>, 85 T.C. 731, 742-743 (1985) ("[W]e must have some basis on which an estimate may be made."). As the Court of Appeals stated in <u>Cohan v. Commissioner</u>, 39 F.2d at 543-544: "Absolute certainty in such matters is usually impossible and is not necessary", but a court "should make as close an approximation as it can, bearing heavily if it chooses upon the taxpayer whose inexactitude is of his own making."

The invoices Mr. Schwartz provided to petitioner with respect to work completed in 2011 all relate to a single project: rehabilitation of the burn area. There is therefore no need for any estimate with respect to 2011. The only issue presented with respect to 2011 is whether the rehabilitation project is a capital improvement.

[*13] IV.  2010 Expenditures

    A.  Spring Line

The Court finds that no expenditures in 2010 relating in any way to the spring line are deductible under section 162 because they must be capitalized under section 263.

Petitioner alleges that the spring line was entirely replaced in 2009 with new black pipe.  Petitioner testified that after the first replacement

> [t]he black poly pipe began leaking the first year it was put in [i.e., 2009] and we replaced a section of it in the fall of 2009.  And then when spring [2010] came along there were also new leaks that cropped up in the new black poly and we replaced those three locations.  So it just was an ongoing problem with the new black poly[. It] was not holding.  * * * There was water bubbling out of the ground[.] * * * We dug out from the point the water was bubbling out of the ground until we found * * * [the source of the leak,] which was at [the] joints.

Petitioner and Mr. Schwartz were unsure what the exact cause of the leaks was.  The only explanation offered was that the joints between the pipe sections were not secured to the pipe sections well enough to withstand the water pressure through the line.

The record does not show how much of the new black pipe was replaced in 2009.  But Mr. Schwartz' testimony and invoices support petitioner's testimony with respect to the work completed in 2010.  Invoice 7100 shows that three

[*14] portions of the spring line were replaced with blue pipe early in 2010. Petitioner testified that these three replacements amounted to 600 feet of the line. And Mr. Schwartz' testimony and Invoice 7112 show that an additional 1,200 feet was also replaced with blue pipe in 2010. Petitioner testified that the entire length of the line is 3,800 feet. Altogether, the replacements in 2010 amounted to approximately 47% of the line ((600 + 1,200 ) / 3,800 = 47%).

Petitioner explained: "[A]s soon as we knew that the new black poly joints were failing regularly, we decided to replace the remaining black poly pipe that we hadn't replaced in 2009 and 2010. We finished the job." In other words, if the Court takes petitioner at her word, the spring line was replaced once completely in 2009 (with new black pipe), and then apparently was entirely replaced, again, between 2009 and 2010 (with blue pipe).

On the basis of the entire record, the Court finds that the whole spring line was replaced at least once over the course of 2009 and 2010. On that point, all the evidence is in agreement. Petitioner's allegation, however, that the spring line was completely replaced twice is supported only by her own testimony, which conflicts with Mr. Schwartz' testimony. Mr. Schwartz testified that when he replaced a portion of the spring line with blue pipe in 2010, "to begin with it [the black pipe he was replacing in 2010] was put in I don't know how many years ago, but a long

[*15] time." He also testified that he was "not around when that [black pipe] was put in", even though petitioner claimed Mr. Schwartz began working for her in 2009. Although Mr. Schwartz did acknowledge that his memory was not perfect, the Court found him to be a credible witness.

If, as Mr. Schwartz' testimony would suggest, there was only one replacement of the spring line, then the work Mr. Schwartz completed in 2010 was part of a "'general plan' of rehabilitation, modernization, and improvement" to completely replace the spring line, a project petitioner took up in 2009 and completed in 2010, the costs of which must be capitalized. Wehrli, 400 F.2d at 689. This is clear because (1) the relevant asset, i.e., the spring line, was completely replaced, (2) the use of blue pipe to replace the old black pipe extended the life of the asset well beyond 2010, and (3) the value of the spring line was increased (because of the use of a new and better pipe with better joints). Petitioner argues that the life of the asset was not extended and that the value of the spring line was not increased. Yet it is difficult to understand how asset life and value could remain the same considering that the old, crumbling, and leaky pipe was entirely replaced with new and higher quality pipe.

Petitioner argues that--even if the line was completely replaced only once--replacement of the line was a repair (or a repair in part) because large discharges

**[\*16]** of water from the Stubbs pad destroyed parts of the spring line in 2009 and 2010, and replacement was her only option. But even if the complete replacement of the spring line described above was occasioned by a flood or a series of floods, it would not change the result. In Hunter v. Commissioner, 46 T.C. 477, 484 (1966), an old dam was washed out by flooding, and the Court found that the construction cost of a replacement dam had to be capitalized:

> We find no merit in petitioner's contention that the expenditures in question were for the 'repair' of the old dam, a part of which remained in the Purgatoire River as an integral part of the overall irrigation system. The record shows that the new dam was constructed 30 feet downstream from the site of the former dam, was of a different and sturdier type of construction, and undoubtedly has a greater useful life than the old dam. * * * The record indicates that Highland and its stockholders had attempted to repair the old dam without success, and then decided to build a new dam. * * *

The Court finds petitioner's situation closely analogous. Whether the spring line ceased to work because of a flood or merely because of the passage of time, petitioner ultimately decided to replace, rather than repair, the whole line with a different and sturdier pipe of greater value and useful life than the pipe that was removed. See Wehrli, 400 F.2d at 689 ("[A]n expenditure made for an item which is part of a 'general plan' of rehabilitation, modernization, and improvement of the

[*17] property, must be capitalized, even though, standing alone, the item may appropriately be classified as one of repair.").[4]

In the alternative, petitioner contends that the complete replacement was merely a conglomeration of repairs deferred from years in which she did not have the funds to complete repairs. But this alternative argument fails for the same reason as the argument just addressed. If petitioner did defer repairs for many years, nevertheless she ultimately decided that complete replacement of the asset was the proper course of action. Therefore replacement of the spring line was a capital improvement.

Even if the Court were to accept for the sake of argument petitioner's claim that the spring line was entirely replaced twice, the expenditures petitioner made in 2010 were still part of a single general plan of rehabilitation. While it is not altogether clear from her briefs, petitioner's argument appears to be: (1) petitioner completely replaced the spring line in 2009 under a plan of capital improvement; (2) that plan of capital improvement ended when the first replacement of the spring line was complete; (3) faulty joints and flooding required that the line be replaced, again, in 2009 and 2010; but (4) the second replacement was merely a repair of the asset which had been installed in 2009.

---

[4]The Court will address petitioner's flooding argument more fully below.

[*18] But even if the spring line was replaced twice, petitioner decided to entirely replace the spring line the second time, rather than repair it. The work in 2010 was therefore a capital improvement--it does not matter whether petitioner had no other option than to replace the line.

And in any event, the work completed in 2010 was merely a continuation of the capital improvement begun in 2009 with the first replacement of the line. "Unanticipated expenses that would be deductible as business expenses if incurred in isolation must be capitalized when incurred pursuant to a plan of rehabilitation." Norwest Corp. v. Commissioner, 108 T.C. at 280 (citing Cal. Casket Co. v. Commissioner, 19 T.C. 32 (1952)). If, as petitioner claims, the spring line was replaced twice because of failure of joints or because of flooding, nevertheless all of these expenditures were unanticipated expenses incurred in pursuit of the overall goal of the first plan of rehabilitation, namely, to replace the old spring line with a new and working spring line. Cf. Bank of Houston v. Commissioner, T.C. Memo. 1960-110, 1960 Tax Ct. Memo LEXIS 175, at *12 ("The Code * * * does not envision the fragmentation of an over-all project for deduction or capitalization purposes.").

Petitioner argues against this conclusion, again contending that the alleged second replacement of the spring line, or at least work done to a spring box and

**[*19]** pressure tank (specific components of the spring line), were repairs required because of damage from large water flows across the property in 2010. Respondent argues that petitioner has not established that these water flows ever occurred and that therefore petitioner has not met her burden to show that replacement of the line was a repair. As the Court will describe in the next few paragraphs, after careful review of the record the Court finds that petitioner has not met her burden to show that any water damage to the spring line was not a direct result of--and therefore an unanticipated expense relating to--her capital improvement program.

On the basis of consistent statements across the entire record, the Court is satisfied that (1) relevant parts of petitioner's property are on a relatively steep grade; (2) the surface is relatively loose and gravely over most of petitioner's property; and (3) in 2009 and 2010 petitioner's property experienced high amounts of rainfall. (Petitioner testified that "in 2010 we had heavy rains. We also had flooding issues. The high water * * * ran longer and harder than normal.")

Petitioner explained that the spring head is in a "gulch". This gulch is visible on the map of the property that she provided. See infra appendix Exhs. 17-P, 23-R. According to petitioner's map, the spring head is toward the bottom of the gulch (in the northern part of the gulch). Petitioner's south field and the

**[\*20]** Stubbs pad are above the spring head to the south-southwest (the Stubbs pad is to the south of petitioner's south field). It may be true that runoff from the Stubbs pad went down through the gulch. But given the topography of the southern portion of petitioner's property, it must also be true that the gulch naturally collects runoff from a portion of the southernmost part of petitioner's land and from at least some of the land above her southern property line.

Replacement of the entire spring line, as petitioner claims occurred, would have necessitated digging up the portion of the spring line in the gulch. This conclusion is supported by the report compiled by the Colorado Oil and Gas Commission in response to petitioner's report of an alleged 2009 Stubbs pad spill. The report states: "In physical investigations it was clear that a significant amount of water had flowed down the gully from the Stubbs pond causing erosion of <u>recently excavated ground</u> and damaging the spring". (Emphasis added.) That is, the ground damaged by runoff in 2009 had been recently disturbed.

Putting all this together, the Court concludes that--whether or not there was a discharge of water from the Stubbs pad--petitioner has not met her burden to show that any damage to the spring line was anything other than an unanticipated expense relating to replacement of the spring line. In 2009 petitioner dug a four-

[*21] foot-deep trench[5] to replace the pipe the first time, in the process necessarily breaking up any surface vegetation or soil compaction that would naturally retard erosion and hold the soil in place. She dug this ditch at the bottom of a gully that provides natural drainage on a relatively steep grade for at least a couple dozen acres, and the ditch was roughly parallel to the natural direction of water flow off the bottom of the gully. No evidence in the record indicates that any form of swale or retaining wall was installed above the spring head. As might have been expected, some or all of the recently disturbed gravelly soil at the top of the spring head was dislodged in 2009 by water flowing down the steep grade and through the gulch following a heavy rain. Petitioner replaced the soil in 2009 (again, no evidence indicates that any form of swale or retaining wall was installed above the spring head), and according to petitioner it was again washed out in 2010 after another period of heavy rain. Considering these facts, the Court concludes that-- whether water was discharged from Stubbs pad or not--petitioner has failed to establish that any work done to the spring line at the spring head after the initial replacement was anything other than continued efforts to prevent erosion that arose as a direct result of her plan of replacement.

---

[5]Petitioner testified that the trench was four feet deep.

[*22] A similar situation occurred in <u>Mt. Morris Drive-In Theatre Co. v. Commissioner</u>, 25 T.C. 272 (1955), where the taxpayer constructed a drive-in theatre without including a drainage system for runoff from the parking area. It became clear that the remodeled topography caused a material increase in runoff onto abutting properties. As the Court described, <u>id.</u> at 274:

> Within a year after petitioner had finished its inadequate construction of the drive-in theatre, the need of a proper drainage system was forcibly called to its attention by one of the neighboring property owners, and under the threat of a lawsuit filed approximately a year after the theatre was constructed, the drainage system was built by petitioner who now seeks to deduct its cost as an ordinary and necessary business expenses, or as a loss.

The Court held that construction of the drainage system was a capital expenditure.

Assuming that petitioner replaced the whole line in 2009, petitioner embarked on a plan at that time to replace whatever existed before 2009 with a working spring line, just as the taxpayer in <u>Mt. Morris</u> embarked on a plan to construct a drive-in theatre. Like that of the taxpayer in <u>Mt. Morris</u>, petitioner's first attempt was inadequate because the joints failed (for whatever reason) and because the spring head eroded (and mud washed into the line, damaging the spring box and pressure tank, among other things). To complete her plan petitioner claims that in 2009 and 2010 she dug out the new black pipe and replaced it, again, with blue pipe--a more expensive, higher quality pipe.

**[\*23]** Petitioner also claims she repeatedly replaced the newly disturbed soil on top of the spring head because the disturbed soil would not stay in place. These efforts, like the efforts of the taxpayer in <u>Mt. Morris</u>, were the result of the capital improvement project of the previous year and were necessary in this case to bring a plan of capital improvement, i.e., complete replacement of the asset, to working order. Therefore, considering all the facts and circumstances, the Court concludes that the current case is more similar to <u>Mt. Morris</u> than it is to, for example, such cases as <u>Midland Empire Packing Co. v. Commissioner</u>, 14 T.C. 635 (1950) (lining basement walls with concrete to prevent seepage of oil from a neighboring property into the basement was a repair, whose costs were immediately deductible), or <u>Plainfield-Union Water Co. v. Commissioner</u>, 39 T.C. 333 (1962) (lining a pipe with concrete after acidic water wore away the previous lining was a repair, whose costs were immediately deductible). In those cases it was clear that the context in which the expenditures were made was one of repair whereas in this case there is a direct causal link between a clear plan of improvement and the subsequent, temporally proximate, unanticipated expenditures.

For these reasons, the Court finds that all of the expenditures relating to the spring line must be capitalized and therefore are not deductible under section 162.

**[\*24]** B. Access Road Washout

Petitioner also claims that flooding completely destroyed a portion of one of the roads on her property, requiring her to replace it. Petitioner argues on brief:

> When the storm water was released onto petitioner's property, a long portion [of the] Access road from the spring to the south field was washed away. The water came down and flowed south from the Stubbs Pad, completely washing out the gravel and road. It was as if it never existed because the damage was so bad. Mr. Schwartz's testimony simply confirms what petitioner said about that portion of the Access [road], which was that it was rebuilt. [Citations of the record omitted.]

By petitioner's own admission, therefore, the work done on the access road was a complete replacement of that portion of the road, rather than maintenance of an existing road. Like the dam in Hunter v. Commissioner, 46 T.C. at 484, described above, the asset petitioner claims to have repaired had been completely washed away. In other words, this is not a case involving normal grading and regraveling of a dirt road, or repair of minor weather damage; rather, the entire portion of the road that was destroyed had to be completely rebuilt from the ground up. Because by petitioner's own admission the work on the access road as a result of flooding was a complete replacement of the portion of the road from the south field to below the spring, it must be capitalized. (Further, petitioner has not provided evidence sufficient to demonstrate how much was spent on the access road project;

[*25] even if petitioner were to prevail on this issue, there is not enough in the record to estimate an amount allocable to the access road project.[6])

### C. Aggregate Cost of Spring Line and Access Road Replacement

Petitioner describes the first project category on her allocation document as "Damage from * * * Stubbs Well Pad". In her opening brief petitioner explains that this category comprises expenditures relating to "[r]epair of damage to the Spring Line and Access Road caused by the water released from the * * * Stubbs Well Pad ($61,161.10, plus $860.00 for the cost to repair the Spring Box)". Petitioner describes the second project category on her allocation document as "Spring line Repairs". In her opening brief, petitioner explains that this category comprises expenditures relating to "[o]ther Spring Line repairs due to leaks and a tank blowout ($61,610.65)". Additionally, the record reflects that petitioner also paid $167.50 to Mead Fencing for fencing completed as part of the spring line replacement project.

For the reasons provided above, all of the work on the spring line (in both project categories, and including the related fencing cost and the cost of repairing the spring box) must be capitalized; the replacement of the access road must also be capitalized. In total, $123,799.25 is attributable to these two projects on the

---

[6]See infra note 13.

[*26] basis of petitioner's allocation. This amount may not be deducted under section 162.

D. Storage Yard

Petitioner claims that $16,202.50 was spent on construction of a storage yard, and $656.80 was spent on fencing work relating to the new construction. Mr. Schwartz testified that the storage yard did not exist before he built it. Petitioner's testimony supports Mr. Schwartz' testimony. Petitioner has not offered any argument that construction of the storage yard was anything other than a capital improvement. Moreover, nothing in the record supports a finding that the cost of work done to the storage yard was for any kind of repair or other deductible expense. Petitioner's implication appears to be that because she used the bare patch of earth where the storage yard now sits as a parking area before the new construction, the newly constructed yard is not a capital improvement because it is now used for the same purpose. But new construction on top of previously unimproved land is necessarily an "improvement", and consequently the costs must be capitalized. Therefore, petitioner may not deduct under section 162 the $16,859.30 she estimated for the storage yard project.

**[*27]** E. <u>Invoice 7100</u>

In light of the foregoing analysis, the Court now completes its examination of petitioner's 2010 expenditures by looking at each of the 2010 invoices in turn.

Invoice 7100 references excavation "in front of house", which Mr. Schwartz testified set a new grade around a garage near petitioner's father's house so that water would drain away from the garage.[7] The Court finds that the cost of the new grade of the garage area is not deductible under section 162 because setting the grade was a capital improvement to the garage,[8] and in any event the record does not demonstrate that this was anything other than a personal expenditure.

In her allocation document, petitioner attributes all the expenditures listed on Invoice 7100 to the spring line project, work done in relation to a "High Water Ditch", and "Tree Cutting & Removal".[9] Petitioner's allocation document does

---

[7]The Court understands "setting a new grade" to have a meaning different from "grading a road". When one sets a new grade around a building, for example, one is changing the level or pitch of the ground, i.e., changing the subgrade. "Grading a road", on the other hand, typically means putting a finished grade on the surface, i.e., the subgrade remains generally unchanged. The grading around the garage changed the subgrade because it changed the drainage pattern.

[8]No evidence suggests that the new grade was anything other than a capital improvement; and in any event it is unclear how setting a new grade could be anything other than a capital improvement.

[9]Mr. Schwartz testified that the tree cutting was part of the access road

(continued...)

**[*28]** not allocate any expenditures from Invoice 7100 to the new grade project around petitioner's garage. That is, what appears to be a relatively substantial number of nondeductible expenditures listed on Invoice 7100 is not accounted for in petitioner's allocation document. The Court therefore finds that the allocation document does not accurately allocate the expenditures listed on Invoice 7100, and accordingly the Court disregards the allocation document with respect to Invoice 7100. The record is otherwise devoid of any basis on which to estimate the number of deductible expenditures on Invoice 7100. Consequently, petitioner may not deduct under section 162 any of the expenses listed on Invoice 7100.

F. Invoice 7101-7102

In her allocation document, petitioner attributes all of the expenditures on Invoice 7101-7102 to the spring line project, "Road Maintenance", repair of a culvert that was destroyed by flooding, "Tree Cutting & Removal", digging holes for new grape plants, and spreading manure on the south field.

The Court has held above that expenditures included in the spring line project are not deductible under section 162. Petitioner has not argued that

---

[9](...continued)
project already discussed. As such, it is a capital expenditure.

[*29] expenditures for digging holes for grapes plants are deductible, and in any event section 263A requires that those expenditures be capitalized.[10]

The Court also concludes that none of the "Road Maintenance" expenditures on Invoice 7101-7102 are deductible. A substantial portion of the "Road Maintenance" expenditures were for work done to "driveways" and work done around a "new barn". No evidence in the record suggests that the "driveways" are anything other than petitioner's personal driveways. The expenditures on driveways are therefore not deductible under section 162 by reason of section 262. Mr. Schwartz testified that the barn was newly constructed, and that before the work listed on Invoice 7101-7102, there was no gravel around the barn. The Court finds that the work done around the barn was part of the barn construction project. It was therefore a capital improvement, and the costs may not be deducted under section 162. Because the record provides no basis for estimating how much of the "Road Maintenance" amount is attributable to nondeductible expenditures, the Court finds that the whole category is not deductible under section 162.

---

[10]Sec. 263A requires that expenditures relating to tangible personal property produced by a taxpayer must be capitalized. Sec. 263A(d)(1)(A)(ii) provides an exception for "[a]ny plant which has a preproductive period of 2 years or less"; but petitioner conceded during her testimony that grape vines have a preproductive period of 4 to 10 years.

[*30] Respondent concedes that the remaining expenditures listed, i.e., those relating to repair of a culvert, tree cutting, and manure spreading, are deductible under section 162, and the Court accepts respondent's concessions. Respondent argues, however, that petitioner's allocation of expenses to these items is not reasonable and therefore that no amount may be deducted. The Court notes that, in addition to the expenditures listed on petitioner's allocation document, Invoice 7101-7102 also indicates that Mr. Schwartz charged for moving equipment used in several of the projects on and off site and for hauling in a stockpile of road materials.[11] That is, like Invoice 7100, Invoice 7101-7102 lists expenditures not accounted for in petitioner's allocation document.

The Court is satisfied, however, that petitioner is entitled to deduct $9,000 under section 162 with respect to the culvert, tree cutting, and manure spreading. See Cohan v. Commissioner, 39 F.2d at 544 (the Court may estimate expenses if

---

[11]The record does not disclose exactly when and where these stockpiles were used.

[*31] there is an adequate basis for doing so).[12]  In total, therefore, petitioner may deduct $9,000 of the expenditures listed on Invoice 7101-7102.

G.  Invoice 7112 and Invoice 7113

Petitioner's allocation document allocates all of the expenditures on Invoices 7112 and Invoice 7113 to the spring line and storage yard projects.  As described above, the Court has found that these expenditures are not deductible. Therefore, none of the expenditures listed on these two invoices is deductible.

H.  Invoice 7114-7115

Petitioner's allocation document states that all expenditures listed on Invoice 7114-7115 are attributable to the storage yard project and to two separate but identically titled "Weather Damage" subcategories of "Damage from * * * Stubbs Well Pad".  As noted above, petitioner has stated that "Damage from * * * Stubbs Well Pad" consists entirely of expenditures relating to "[r]epair of damage to the Spring line and Access road caused by the water released from the * * * Stubbs Well Pad".  Accordingly, because the Court held above that expenditures relating to the storage yard, access road, and spring line projects are not deductible

---

[12]The Court is satisfied that petitioner's estimate of $1,080 with respect to the culvert repair is accurate.  The Court is also satisfied that petitioner has provided enough of a basis to estimate expenditures for tree cutting and manure spreading in an amount which is approximately two-thirds of the amounts petitioner estimated.

**[*32]** under section 162, no expenditures listed on Invoice 7114-7115 are

deductible.[13]

    I. <u>Invoice 7116</u>

Invoice 7116 lists work that was apparently a continuation of work listed on

Invoice 7114-7115, i.e., the access road project. As described above, this portion

of the expenditures is not deductible under section 162. The invoice also lists

expenditures petitioner concedes are not deductible because they were personal.

---

[13]For the sake of completeness the Court also notes that, even if petitioner had not admitted that the access road project was a complete replacement of the portion of the road replaced, the record provides no basis to estimate how much was spent on the access road, and therefore petitioner may not deduct under sec. 162 any amount relating to the access road. It may be that petitioner meant the Court to infer that one of the "Weather Damage" subcategories relates to the spring line project and one to the access road project; but Invoice 7114-7115 also lists unrelated weather damage near petitioner's father's house, so it may also be that one of the "Weather Damage" subcategories refers to that project and the other "Weather Damage" subcategory relates to both the spring line and access road projects.

Additionally, Invoice 7114-7115 lists expenditures not accounted for anywhere: The invoice states that Mr. Schwartz moved baskets of dirt and concrete forms, established a grade around one of the houses and one of the garages, and worked on a driveway. These unallocated expenditures appear to be personal (the record does not provide a basis for any other conclusion) and therefore may not be deducted under sec. 162.

In short, the Court has carefully reviewed Invoice 7114-7115 and all related evidence, and finds that as a result of the irregularities and ambiguities just described, the record does not provide sufficient basis to make an estimate of the access road expenditures.

**[*33]** These personal expenditures are not accounted for anywhere in petitioner's allocation document.

In addition to the access road and personal expenditures, Invoice 7116 also lists expenditures on a road from "Kuiper's Gate" to the access road below the spring area, i.e. Kuiper Road. Curiously, petitioner's allocation document indicates that "Kuiper gravel & grade" expenditures listed on Invoice 7116 are a subcategory of "Damage from * * * Stubbs Well Pad". As described above, petitioner's brief describes the "Damage from * * * Stubbs Well Pad" category as comprising expenditures relating to the spring line and access road projects, whereas Mr. Schwartz clearly testified (and petitioner's map shows) that Kuiper Road is a different road.

The Court has carefully reviewed Invoice 7116 and all related evidence, and concludes that (1) the irregularity with respect to the Kuiper Road expenditures and (2) the unallocated personal expenditures appearing on Invoice 7116 considerably undermine the allocation document with respect to this invoice. The Court finds as a result that there is insufficient evidence on which to make an estimate of deductible expenses and holds that none of the expenditures listed on Invoice 7116 is deductible under section 162.

**[\*34]** J.  Mead Fencing Invoices

As noted above, expenditures on the two invoices from Mead Fencing relate to the spring line and access road projects and are therefore not deductible.

K.  Conclusion

In sum, for 2010 petitioner may deduct $9,000 out of the $199,031 disallowed by respondent.  The remainder is not deductible under section 162.

V.  2011 Expenditures

As petitioner claims, the "only work for which a deduction was claimed in 2011, involved removing burned tree stumps and boulders from the Burn Area." Petitioner testified that the reason for removing the stumps and boulders was to bring the land back to productive use following a fire.

Petitioner offered no argument in her opening brief to address whether the 2011 expenditures may be deducted; the Court could therefore deem petitioner to have waived or conceded this issue but will nevertheless consider the merits.

Petitioner testified that the burn area rehabilitation project "is going to be a long-term process.  Decades before it even grows forage as it would normally do in that area."  Respondent's opening brief argues that the 2011 expenditures are part of a plan of rehabilitation under Wehrli, 400 F.2d at 689.  In her answering brief, petitioner argues that (1) respondent has offered no evidence of a plan of

[*35] rehabilitation, (2) the expenditures did not improve the land or the value of the land, (3) the work was not extensive, (4) the work was not directed at adapting the burn area to a new or different use, and (5) the expenditures are repairs under R.R. Hensler v. Commissioner, 73 T.C. 168 (1979). The Court will address each argument briefly.

First, the burden is on petitioner to prove her case. Respondent is not required to offer evidence to prove that petitioner had a formal plan. Moreover, the evidence in this case clearly shows that petitioner has developed a plan of rehabilitation for the burn area; petitioner said as much. Second, petitioner clearly thinks that the expenditures will improve (over a very long period) both the land and the value of the land; it is difficult to understand why petitioner would have spent $47,630 otherwise. Third, the work was clearly extensive as it involved removal of stumps and boulders, at significant expense, from the entire burn area, which petitioner testified comprises about 26 acres.

Fourth, petitioner testified that before the fire the burn area was used for "shade and privacy for the property. Shade and a little bit of grazing for horses or cattle." The Court understands this statement to mean that a small portion of the burn area was used for grazing before the fire and the rest of the burn area had no

[*36] relation to petitioner's business.[14] After the fire petitioner cleared the whole 26-acre area for future use in the production of forage. That is, before the fire, a small portion of the area was used for grazing and forage, whereas after the fire, the whole area was converted to that use. On these facts the Court is unable to conclude that petitioner's expenditures did not adapt a significant portion of the land to a new use. Accordingly, the Court rejects petitioner's argument that her plan of rehabilitation did not adapt the area to a new or different use.

Finally, with respect to petitioner's last argument, R.R. Hensler v. Commissioner, 73 T.C. at 181-182, involved repair of machinery after damage from a flood--as the Court described:

> [M]achinery and equipment used directly in the conduct of * * * [the taxpayer's] business was damaged by a flood, and the expenditures were made to recover and repair the equipment for further use in the business. How long the equipment would be used after it was repaired is not apparent from the record, but a major portion of it would apparently be used only to complete the contract, and the repairs did not extend its useful life or improve it over its condition prior to the flood. * * *

R.R. Hensler is distinguishable because a major portion of the repairs held to be deductible in that case served to complete the immediate contract, whereas as described above petitioner appears to have changed her use of the property from

---

[14]Petitioner provided no clearer statement explaining the use of the burn area before and after the fire.

[*37] mostly undeveloped land before the fire to forage or pasture land after the fire--i.e, some substantial portion of the expenditures appears to have been directed at developing a business use for the burn area.

Accordingly, the Court sustains respondent's determination that petitioner may not deduct under section 162 any of the $47,630 of 2011 deductions disallowed in the notice of deficiency.

## VI.  2010 Section 6662(a) Penalty

Section 6662(a) imposes a penalty of 20% on the portion of an underpayment attributable to any one of various factors, including "[n]egligence or disregard of rules or regulations" and "[a]ny substantial understatement of income tax."  Sec. 6662(a) and (b)(1) and (2).[15]  Respondent has determined a section 6662(a) penalty on petitioner's 2010 underpayment for both reasons.

---

[15]Respondent has the burden of production with respect to penalties.  Sec. 7491(c).  In Graev v. Commissioner, 149 T.C. ___ (Dec. 20, 2017), supplementing and overruling in part Graev v. Commissioner, 147 T.C. ___ (Nov. 30, 2016), the Court held that showing compliance with sec. 6751(b) is part of the Commissioner's burden of production under sec. 7491(c) for those penalties to which sec. 6751(b) applies.  This case was submitted before these developments. Consequently, the parties have not addressed the application of sec. 6751(b) to this case in the light of Graev.  It is, however, unnecessary to consider whether the requirement of sec. 6751(b) applies or is met in this case because on the basis of the specific facts of this case and for the reasons specified below the Court has determined that the sec. 6662 penalty does not apply.

**[\*38]** A penalty under section 6662(a) does not apply to any part of an underpayment of tax if there was reasonable cause for such portion and the taxpayer acted in good faith with respect to such portion. Sec. 6664(c)(1). Petitioner bears the burden of proving reasonable cause and good faith. See Higbee v. Commissioner, 116 T.C. 438, 449 (2001). "Circumstances that may indicate reasonable cause and good faith include an honest misunderstanding of fact or law that is reasonable in light of all the facts and circumstances, including the experience, knowledge, and education of the taxpayer." Sec. 1.6664-4(b)(1), Income Tax Regs.

Respondent determined a section 6662(a) penalty with respect to 2010 only. Petitioner was ultimately incorrect in her attempt to claim the deductions the Court has disallowed with respect to 2010. Considering all of petitioner's testimony and the documentary evidence she submitted, the Court is nevertheless satisfied that even though she spent extensive time and effort researching and preparing her tax return petitioner honestly misunderstood both the facts and the law applicable to her case. Taking into account petitioner's relative inexperience preparing tax returns, her lack of knowledge with respect to the sometimes complicated issue of whether an expenditure must be capitalized, and the fact that she did have extensive records showing in detail the expenditures that had been made, the Court

**[*39]** concludes on the basis of the entire record that petitioner has shown reasonable cause and good faith with respect to her entire 2010 underpayment. Accordingly, the Court does not sustain the section 6662(a) penalty.

To reflect the foregoing,

<u>An appropriate order will be issued, and decision will be entered under Rule 155</u>.

**[*40]**                                APPENDIX

<u>Exhibit 17-P</u>

<u>Aerial Map Legend</u>

1.      Damage from WPX Stubbs Well Pad

2.      Spring Line Repairs

3.      Road Maintenance

4.      High Water Ditch Damage

5.      Tree Cutting & Removal

6.      Grape Holes

7.      South Field Manure Spread

8.      Storage Yard

9.      Mead Fencing Repairs

10.    Burn Area

**[*41]**



**[\*42]** <u>Exhibit 23-R</u>

